### NIAGARA FALLS POWER CO. v. FEDERAL POWER COMMISSION.
### No. 293.

Circuit Court of Appeals, Second Circuit.
July 29, 1943.

---

Joseph M. Proskauer and LeBoeuf & Lamb, all of New York City (Randall J. LeBoeuf, Jr., of New York City, Warren Tubbs, of Buffalo, N. Y., and Lauman Martin and J. Alvin Van Bergh, both of New York City, of counsel), for petitioner.

Charles V. Shannon, General Counsel, Louis W. McKernan, Principal Atty., and

Stanley M. Morley, Atty., all of Washington, D. C., for respondent.

Before L. HAND, AUGUSTUS N. HAND, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The petitioner seeks to set aside two orders of the Federal Power Commission by petition filed under § 313(b) of the Federal Power Act 16 U.S.C.A. § 825l(b): the first order, entered on June 9th, 1942, ordering the petitioner to reduce its capitalization to $24,680,680.22; "the actual legitimate original cost" of its properties on March 2, 1921, exclusive of some items not here in question: the second order vacating a stay of the first. The specific controversy is over the elimination of three items from the petitioner's capital account, all carried over from the capital accounts of three companies, out of which it was formed by a consolidation under Chapter 596 of the Laws of New York of 1918. The first of these three companies to be formed was the Niagara Falls Hydraulic Power and Manufacturing Company, organized as a New York corporation in 1878 by one, Schoellkopf, and others. It acquired from the State of New York the right to divert waters of the Niagara River about a mile above the Falls, through a canal to a basin below the Falls. Originally it used the power mechanically only; but in 1895, it began the substantial development of electric power. After 1907, when it became subject to regulation by the New York Public Service Commission, its owners, on March 15, 1909, organized the second company, the Cliff Electrical Distributing Company, which we shall call the "Cliff Company," and transferred to that company the distributing parts of its property, on January 1, 1910. On March 24th of that year the Niagara Falls Hydraulic and Manufacturing Company was merged in the Hydraulic Power Company of Niagara Falls, which had been incorporated three days earlier, and which we shall call the "Hydraulic Company." The third company, the Niagara Falls Power Company, which we shall call the "Tunnel Company," was organized on March 31, 1886, and also got rights from the State of New York to divert the waters of the Niagara River at a point above the intake of the "Hydraulic Company." Later the "Tunnel Company" was taken over by the Cataract Construction Company, which we shall call the "Cataract Company," by the acquisition of all its stocks and bonds. Chapter 596 of the Laws of 1918 of New York, which consolidated these three companies (not including the "Cataract Company") "into a single new corporation," declared that its capital might equal, but should not exceed, the "aggregate of the outstanding capital stocks and the surpluses as, unimpaired reserves and undivided profits" of the three constituents. When the "Cliff Company" took over the distributing property of Niagara Falls Hydraulic Power and Manufacturing Company, it increased its own capital account by $328,471.51. When the Niagara Falls Hydraulic Power and Manufacturing Company was merged in the "Hydraulic Company" in 1910, the capital account of "Hydraulic Company" was increased by $11,800,482.24. When the "Cataract Company" took over the "Tunnel Company" in 1889, the capitalization of the "Tunnel Company" was increased by $3,307,974.83, substantially all of which was profit on three transactions between the "Cataract Company" and the "Tunnel Company" in the sale of lands and in the construction of plant and transmission lines.

The consolidation of 1918 was an amalgamation of two separate groups: one called the "Stetson Group," which owned the "Tunnel Company"; and the other the "Schoellkopf Group," which owned the "Hydraulic" and "Cliff Companies." Each group turned its property over to the petitioner in exchange for the petitioner's shares: the "Tunnel Company" receiving $11,515,400 par value in preferred stock, and $984,566.70 par value, of common stock; the "Hydraulic" and "Cliff Companies" receiving together $13,500,000 of common stock. Ahead of all the stock were $26,241,000 in bonds of the three constituent companies; so that the total capitalization including bonds came to nearly sixty million dollars.

On December 30, 1903, the Niagara Falls Hydraulic Power and Manufacturing Company was granted a license or permit from the United States War Department "to maintain a system of cribs and booms and dikes partially constructed in the Niagara River near Port Day," as shown in an accompanying blue print; and the "Tunnel Company" was granted a similar permit on October 10, 1904, and another on March 7, 1905. None of these authorized the diversion of water; only the occupation of the bed of the stream for so long as "navi-

gation or commercial interests" were not prejudiced. The "Tunnel Company" and the Niagara Falls Hydraulic Power and Manufacturing Company were, however, later granted permits authorizing them to divert water from the Falls. The first of these was issued under the Burton Act of June 29, 1906, which made revocable all permits granted under it, and provided that "nothing herein contained shall be held to confirm * * * any rights heretofore claimed or exercised in the diversion of water or the transmission of power." This act and all permits issued under it, expired in 1913, and the constituent companies had no federal permit until 1917, when the joint resolution of that year was passed. This also provided that "nothing herein contained shall be held to confirm * * * in * * * any such permittee any right in or to the water which he is now diverting or which he may be authorized to divert hereunder." The last permit was granted to the petitioner under the resolution of July 12, 1919; and was by its terms to expire on July 1, 1920, "unless the Congress shall before that date enact legislation regulating and controlling the diversions of water from the Niagara River, in which event this resolution shall cease to be of any further force or effect." The Federal Water Power Act—now Part I of the Federal Power Act—became law on June 10, 1920.

On March 2, 1921, the Federal Power Commission consisted of Newton D. Baker, Secretary of War; John Barton Payne, Secretary of the Interior; and Edwin D. Meredith, Secretary of Agriculture: it granted a license to the petitioner for a term of fifty years which authorized it to divert from the water of the Niagara River above the Falls, not to exceed in the aggregate a daily diversion at the rate of 19,500 cubic feet per second; and which contained the following provisions: "The fair value of the completed parts of the project as of the date of this license shall be determined as early as practicable in the manner prescribed by the Act, and the licensee hereby agrees to accept for the purpose of this license and of any provision of the Act, the fair value so determined, whether arrived at by mutual agreement or as the result of proceedings in or final adjudication by the Courts." Again: "In the determination of the fair value of the project already constructed to be hereafter made as provided by Section 23 of the Act, [16 U.S.C.A. § 816] the fair value of the property of said Niagara plant (Stations 1 and 2) and of said Station No. 2, of the Hydraulic plant and of each of them shall be separately stated." Finally: "Upon the written consent of licensee, the Commission may order made under its seal, modify, alter, enlarge or omit insofar as authorized by law, any one, or more of the conditions or provisions of this license." The recitals in the license spoke of the petitioner's application to divert the water "through the project of applicant already constructed and through project works to be constructed * * * in respect of which project so far as already constructed said applicant had on the 10th day of June, 1920, a permit, right of way, and authority."

On May 13, 1910, when the Niagara River Treaty was proclaimed, none of the petitioner's three constituent companies had any indefeasible right to divert water from the river. It is true, as we have said, that two of them had been granted a limited privilege to set up cribs and booms, but that gave them no right to take any water. All rights granted under the Burton Act, 34 Stat. 626, were to end in 1913; and the joint resolutions, which in any event succeeded the treaty, were plainly intended to serve only as stopgaps. When Congress passed the Federal Water Power Act in 1920, 41 Stat. 1063, 16 U.S.C.A. § 791a et seq., the petitioner's slate was wiped clean; it stood at discretion, so far as concerned any existing federal rights of diversion. Congress had absolute power to stop it from taking any water whatever, or to impose what terms it chose. For support of this we need look no further than Article V of the treaty itself which provided that "no diversion of the waters of the Niagara River above the Falls from the natural course and stream thereof shall be permitted except for the purposes and to the extent hereinafter provided." The United States was then allotted the privilege of diverting within the State of New York from above the Falls "not exceeding in the aggregate a daily diversion at the rate of twenty thousand cubic feet of water per second." When Congress set up the Commission with power to issue licenses for the "utilization of power * * * from * * * any of the navigable waters of the United States" § 4(d) of the Act of June 10, 1920, 41 Stat. 1065, 16 U.S.C.A. § 797(e) the Commission was vested with the

distribution of this allotment, and any rights acquired from the State of New York necessarily yielded to what it might do. Thus the first question turns upon the validity of that provision in the license granted on March 2, 1921, which insured to the petitioner the appraisal of its "net investment" at "fair value."

 The petitioner is right in saying that the Commission at that time supposed that the case fell within the proviso of § 23(a), 16 U.S.C.A. § 816, and meant to issue a license "for a project * * * already constructed" under a "permit * * * heretofore granted." But in that the Commission was mistaken. Subdivision a of § 23 makes immune from the Act "any permit * * * heretofore granted," but allows the holder of "such permit" to apply for a license. Among those who are mentioned as possible holders are "States," so that we must suppose that it was thought just, and perhaps necessary, to protect permits held by states; and such permits could only have been federal. Textually at any rate, that precluded the state's immunity as to projects operated by itself, for the only immunity conferred is upon "permits," "rights-of-way" or "authority" which some authority has granted, and a state acts of its own authority and not by grant. Yet it would be absurd to suppose that a corporation operating under a state's license could be immune from federal control when the same "project" would not be, if operated by the state itself. Furthermore, the purpose of the section falls in line with the verbal interpretation. Although Congress of course meant to exclude certain existing "projects" from the new system, in general its purpose was to set up a system of comprehensive regulation of water power. We must assume that it may have felt its hands tied to some extent; the Supreme Court both before and since 1920, has held indefeasible a grant, once made and acted upon. United States v. Central Pac. R. Co., 118 U.S. 235, 238, 6 S.Ct. 1038, 30 L.Ed. 173; United States v. Northern Pac. R. Co., 256 U.S. 51, 63, 64, 41 S.Ct. 439, 65 L.Ed. 825. There are said to have been many valid licenses outstanding in 1920, issued by federal authorities which it was at least doubtful whether Congress could "affect" at all; § 23(a) excluded these and they adequately account for its enactment. On the other hand, it would have been a groundless compunction which should have protected "permits,"

"rights-of-way" or "authority" granted by municipalities or states. The purpose being to conserve all water power, so far as it was national, it would have been an anomaly to exempt anyone—states or individuals —who by an earlier unauthorized occupation had assumed to appropriate any part of this natural resource. No prescription could in law run against the nation; we must not impute to Congress any willingness to grant prescription as a favor. Indeed, there are occasions when even federal authority, lawfully exercised, has been construed not to protect those who have acted upon the faith of it. Philadelphia Co. v. Stimson, 223 U.S. 605, 32 S.Ct. 340, 56 L. Ed. 570; Greenleaf-Johnson Lumber Co. v. Garrison, 237 U.S. 251, 35 S.Ct. 551, 59 L.Ed. 939; Pennsylvania Water & Power Co. v. Federal Power Commission, 74 App. D.C. 351, 123 F.2d 155. What equitable claim then has a company which relies upon the grant by a state of something beyond its power? What standing does a state's license give it to seize upon the energy of the nation's streams, or to impair their navigability?

The course of the act through Congress bears out our conclusion. The joint resolutions, beginning with the first—that of January 19, 1917—authorized the Secretary of War to issue permits for the diversion of water, but were, as we have seen, always solicitous to prevent any vested rights from arising, the danger of which was several times mentioned upon the floor. When the last resolution was passed, the Federal Water Power Act had been already bruited, and the resolution itself presaged its prospective passage. When it was introduced, Senator Harrison proposed an amendment expressly excluding the Niagara River, "so that we could really get some legislation beneficial to the consumers in that particular section." Senator Wadsworth, who had charge of the bill in the Senate, answered that the petitioner "will fall completely under the jurisdiction of the Commission just as any other water power company anywhere in the United States falls under it." Later in answer to a question of Senator McKellar, he said that the petitioner and any other company that might be organized "must come to the Commission and get a license, and the Commission can prescribe the conditions upon which the license is to be issued." These were unequivocal assertions that the petitioner's existing rights would not be recognized. Later,

Senator Wadsworth amended the section himself by inserting the provision that the Act should not "confirm" or otherwise "affect" any existing claim; in explanation of which he said that the companies— "rightly or wrongly, I do not know which— have claimed, or have indicated that they might claim, certain continuing rights to the diversion of water and the generation of power * * * I do not want this bill in any way to confirm that claim." While that language does, indeed, shed no light upon whether § 23(a) was intended affirmatively to overbear state grants, at least it should not throw doubt upon the earlier categorical statements that they should not prevail.

■■■ The respondent was therefore right in holding that, at any rate as a new question, the petitioner was not entitled to have its "projects" appraised at their "fair value." Whether the respondent should have followed the construction of the first Commission, is another matter. In spite of the plenitude of discussion in recent years as to how far courts must defer to the rulings of an administrative tribunal, it is doubtful whether in the end one can say more than that there comes a point at which the courts must form their own conclusions. Before doing so they will, of course,—like the administrative tribunals themselves—look for light from every quarter, and after all crannies have been searched, will yield to the administrative interpretation in all doubtful cases; but they can never abdicate. Even Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301,—a case which perhaps went as far as any other,—left no doubt as to this. Mitchell v. United States, 313 U.S. 80, 97, 61 S.Ct. 873, 85 L.Ed. 1201. Be that as it may, the case at bar is different from the usual one in two important respects: (1.) there was no customary interpretation, but only a single instance; and (2.) the tribunal has reversed itself. The conventional reason for the deference exacted from courts for such rulings has always been the advantage possessed by such tribunals in a background of specialized experience and understanding, gathered from a long acquaintance of the members with the subject matter, either while they are in office or before. The continuity of this experience is assumed to build up an acquaintance inaccessible to others—courts included. If so, a single ruling, made shortly after the tribunal has been set up,

should have far less weight than a series of repeated rulings over a course of years. And when that isolated instance is repudiated by the same tribunal in the light of its added experience, it has scarcely any weight at all. Indeed, the very reason which forbids a court from lightly overruling an administrative ruling, a fortiori forbids its undertaking to say that a later ruling is mistaken when it reverses the earlier one. We must assume that continued occupation with the subject has disclosed the past error better than we can do ourselves. We conclude therefore that the petitioner has no right to the appraisal of the "fair value" of its "project" as of March 2, 1921.

The question remains as to what value the Commission should have taken in its place. The proceeding was authorized under § 4(b), 16 U.S.C.A. § 797(b), which allows it "to determine the actual legitimate original cost of and the net investment in a licensed project"; the last being the figure at which the United States may recapture it under § 14, 16 U.S.C.A. § 807, when the license expires, and the base upon which its rates are to be calculated, if it ever engages in interstate or foreign commerce. § 20, 16 U.S.C.A. § 813. Section 3(13), 16 U.S.C.A. § 796(13), defines "net investment": it is "the actual legitimate original cost * * * as defined and interpreted in the 'classification of investment in road and equipment of steam roads, issue of 1914, Interstate Commerce Commission', plus similar costs of additions" etc. We are not, however, to read this definition independently of that provision of § 14 that "net investment shall not include * * * good will, going value, or prospective revenues." On the contrary, since the chief, if not the only, purpose of an investigation under § 4(b), is to find the value on recapture, or the rate base of the licensee, we are to understand the definition of § 3(13) as incorporating these limitations. We first turn to the "Classification" itself.

The Commission, as required by the Act, —§ 3(13)—promulgated it as part of its own rules: it now appears as Part 103 of Title 18. Code Fed.Reg. We may start with § 103.02-2. This provides that the accounts of the carrier "shall be charged the cost of original road, original equipment, road extensions, additions, and betterments." These constituents are then immediately defined. "Original road means the land and fixed improvements provided

and arranged for in the original plan for the construction of a new road." "Original equipment" and "road extensions" are defined in the same way. "Costs shall be actual money costs to the carrier." For the most part the rest of the "Classification" has little relevance to property like the petitioner's; but § 103.41 is more important; it relates to the "Cost of road purchased." It provides that "This account shall include the cash cost of any road * * * purchased"; and that when the sale includes "equipment, securities, and other assets" the "appraised value" of these must be deducted from the cash and only the remainder of the cash shall be charged to the carrier's account. So far, § 103.41 has no application to the case at bar, but the next sentence may be thought to have. It reads as follows: "Where the consideration given for the property purchased is other than cash, such consideration shall be valued on a current cash basis." Similarly, if part of the consideration is the assumption of liabilities, they shall be appraised at their cash value.

While § 4(b) of the Federal Power Act speaks of "actual legitimate original cost" and of "net investment" as though they might differ, § 3(13) declares that "net investment" is "actual legitimate original cost" as defined in the "Classification." Therefore we may dismiss as fanciful the theoretical possibility that "actual legitimate original cost" in § 4(b) can mean anything different from the same phrase as defined in the "Classification," and assume that that definition applies throughout the act whenever "net investment," or "original cost" appears. Were it not for § 103.41 of the "Classification" there could be no doubt that "original cost" meant the cost of the original construction. Section 103.02-2 confines the capital account to "the cost of original road, original equipment, road extensions, additions, and betterments" and defines each of these as that "provided and arranged for in the original plan for the construction of a new road." It is only in § 103.41 that we find another standard, and, although the rulings of the Interstate Commerce Commission—incidentally all made after 1920 and in part at least made under § 19a—the "Valuation Act" 49 U.S.C.A. § 19a—are not entirely plain, it seems to us at least plausible to argue that that section meant to allow the purchaser of a going road to include in his capital account the value in cash or in property of whatever he in good faith paid. At any rate we shall assume arguendo that that is the right reading, although we might hesitate so to hold, if the case turned upon it. For, if that is true, the builder of a road who does not sell it, is at a disadvantage compared with one who does. The builder who does not sell is confined for his base to his original cost; he who sells can assure the buyer that he may use as a base whatever he pays in good faith. If the builder can persuade the buyer to pay more than the original cost the difference becomes part of the base and the public must pay rates computed upon the excess. Surely that is a most undesirable distinction. Be that as it may, we need go no further here than to hold, as we do, that if this be the meaning of § 103.41, at least the consolidation of 1918 was not a "purchase" within its terms.

Certainly not every consolidation is within them; not, for example, that of a parent with its subsidiaries. Alabama Power Co. v. McNinch, 68 App.D.C. 132, 94 F.2d 601, 615, 616. The consolidation of 1918 was not, it is true, of that sort, yet it was also not in any ordinary sense a "purchase." The three companies did not sell their properties to the petitioner, and the petitioner did not buy of them. We do not mean merely that the form of the transaction was not a sale—we should not stand on that—the substance also was not a sale. The properties had been held by two groups of persons: "Stetson" and "Schoellkopf" who combined their interests into one company which thereafter they owned jointly. The allotment of the shares as between the two groups was doubtless the result of genuine competition; presumably it followed the relative values of the properties. But all competition, all "arms-length" bargaining, stopped there; neither party had any interest to reduce the nominal capitalization. Disregarding the form of the transaction, and looking at its effect, the "Stetson Group" conveyed an interest in their properties to the "Schoellkopf Group" in exchange for an interest in properties of the "Schoellkopf Group"; and vice versa. If any part of such a transaction can be regarded as a "purchase" at all, it must be confined to that interest in the properties of the "Stetson Group" which passed to the "Schoellkopf Group," and that interest in the properties of the "Schoellkopf Group" which passed to the "Stetson Group"; for plainly both groups retained

some interest in their old properties after the consolidation. Therefore § 103.41 could by no possibility apply to any interests but those transferred. It would follow that, as to those interests which each group retained, the "original cost" was the test; and as to those interests which each group exchanged, the value "on a current cash basis" of the interests which they received from the other was the test. We will not say that it is impossible to work out a result under such a hybrid test, but it seems to us too plain for debate that when § 103.41 speaks of the "purchase" of a road it does not mean to include a transaction like that at bar. In short, while it may be tolerable to allow a buyer to capitalize the purchase price he may have paid, even though that has been computed upon the assumed continuity of rates which were higher than they should have been, there is surely nothing to be said in favor of allowing two companies mutually to pool their interests, and from that time forward to treat as vested the values they happened then to have. Nothing need be said of the three earlier transactions by which the items in dispute were added to the capital of the "Cliff," the "Tunnel" and the "Hydraulic Companies"; in each case these were between companies which had the same shareholders, and between which there could certainly be no "purchase."

■ We all agree that, for the foregoing reasons, the Commission was right to go back to the original construction cost of the power plants; but Judge FRANK and I think that the same result also follows for other reasons. We believe that § 103.41 of the "Classification" should not be read as incorporated into the Federal Power Act by § 3(13) at all. All that § 3(13) says is that the "actual legitimate original cost" of a plant shall be as defined by the "Classification." We can find no definition of "original cost" in the "Classification" unless it be § 103.02-2. That, as we have seen, mentions the constituent elements "provided and arranged for in the original plan for the construction of a new road"; and while the "Classification" does not use the phrase, "original cost," the "cost" of the "original road" must be taken as the "original cost." Section 103.41 does indeed deal with "cost," and includes the cost to the buyer of an "original road"; but it appears to us a perversion of the phrase "original cost" to make it cover the cost to a successor of the original builder. What can be the meaning of "original cost" in that connection? We start therefore with a textual difficulty which alone seems to us nearly conclusive; and our interpretation is confirmed by § 14. The "original cost" of a construction plant does not involve "going value" or "prospective revenues"; the builder buys the labor, materials and land from those into whose prices neither of those factors has entered; what they sell is convertible into a variety of uses, and the particular use to which the builder of the plant proposes to devote them does not determine their price at all. Quite the opposite is true of the cost of a plant, built and in operation; that is not in the least measured by the original cost of the materials or labor which have gone into it, or the cost of such materials and labor as at the moment of sale would be necessary to produce a plant of equal capacity. The only factor which determines its price is the "prospective revenues" which it will produce. These may be larger or smaller than the "original cost," or the "reproduction cost"; but that will not affect the purchase price, except as the scrap value of the plant serves as a "floor," or bottom price, below which the value will not go.

■ This being true, the "actual legitimate original cost" of § 4(b) and § 3(13) cannot be the price paid by the buyer of a going plant, because that must inevitably include "prospective revenues"; and indeed, can include nothing else, but possible scrap value. That price cannot be taken for the measure of the recapture price except in open defiance of § 14 which expressly forbids the inclusion of "prospective revenues" in "net investment." Finally, the interpretation of § 3(13) which we adopt avoids the discrimination, which we mentioned a short time ago, in favor of such builders as can secure a purchaser for their plants.

An objection may be raised to this argument that it proves too much; because, consistently applied, it would also make the "fair value," allowed to a licensee under the proviso of § 23(a), the "original cost" to the builder, and would thereby destroy the advantage certainly intended to be given to such licensees. The proviso with proper ellipsis reads as follows: "the fair value of said project * * * shall * * * be deemed to be the amount to be allowed as the net investment * * * in said project * * * as of the date of the license, or as of the date of the

determination." If § 14 is always to be read into the term, "net investment," how, it may be asked, can "fair value" include "going value" or "prospective revenues," and if it cannot, is not one driven back to original cost, or is not § 103.41 of the "Classification" to be admitted as part of the definition of "net investment" in all cases? Verbally, the dilemma is inescapable, but the situation is in any aspect an impasse which demands violence to the literal meaning of some of the words used. For there can be no doubt that "prospective revenues" *must not be included* in "net investment"; there can be no doubt that the cost to a buyer must include "prospective revenues"; there can be no doubt that "fair value" was intended to include more than "original cost." The use of "net investment" in the proviso of § 23 (a) will not match with the definition in § 3(13), if we also observe the admonition of § 14. It is not necessary to define what should go into "fair value"; it is necessary only to break through the band of verbal logic at its weakest spot. That spot appears to us to be where § 14 strictly would deny to "prospective revenues" any share in "fair value." Indeed, if some latitude be not imputed to that phrase why should a hearing have been especially provided for that issue? The result would follow rigidly from the definitions themselves. Moreover, this conclusion is confirmed when we consider that in the original form of § 23 "fair value" was in the case of disagreement to be determined by the courts. It is moreover perhaps an added reason for supposing that *§ 14 is not to be read* into the proviso of § 23(a) in determining fair value that, when Congress in 1935 added Part II to the statute, 16 U.S. C.A. § 824 et seq. which relates principally to rates of public utilities engaged in interstate commerce other than licensees under Part I, it provided in § 208(a), as added by Act Aug. 26, 1935, § 213, 16 U.S.C.A. § 824g (a) that, as to such public utilities, the Commission shall ascertain the "actual legitimate [original] cost of the property" but that "when found necessary for ratemaking purposes," it shall also ascertain "other facts which bear on the determination * * * the fair value of such property." Alabama Power Co. v. Federal Power Comm., 75 U.S.App.D.C. 315, 128 F.2d 280, 293 certiorari denied 317 U.S. 652, 63 S.Ct. 48, 87 L.Ed. ——. Incidentally, it follows from § 208 that much of our discussion here may be inapplicable to non-licensed public utilities.

 From what we have said, it would follow that we should affirm the orders in toto, and so we should except for one ruling in which we think that the Commission was wrong. Upon the rehearing the petitioner offered to prove that a part of the profits which the "Cataract Company" had added to the capital of the "Tunnel Company," and which the Commission cancelled from the "net investment," was from the sale by the "Cataract Company" to the "Tunnel Company" of "non-project" lands: i.e. lands, not used as part of the petitioner's power development. To this the Commission made two answers: (1.) that it made no difference whether or not any part of the lands were "non-project" lands, the petitioner should not carry the profits on its books; and (2.) that in any event it had failed at the hearing to identify the supposedly "non-project" lands. The Commission's jurisdiction under § 4(b) is limited to determining the cost of the "net investment in a licensed project"; and a "project" is defined by § 3(11), which we quote in the margin.[1] The only words which could cover lands not actually used for power developments are "miscellaneous structures used and useful in connection with said unit," and "lands, or interest in lands the use or occupancy of which are necessary or appropriate in the maintenance and operation of said unit." By "non-project" lands the petitioner must be understood to have meant lands which do not fall within either of these descriptions; and they should certainly not be included within the "net investment" of the

[1] "(11) 'project' means complete unit of improvement or development, consisting of a power house, all water conduits, all dams and appurtenant works and structures (including navigation structures) which are a part of said unit, and all storage, diverting, or forebay reservoirs directly connected therewith, the primary line or lines transmitting power therefrom to the point of junction with the distribution system or with the interconnected primary transmission system, all miscellaneous structures used and useful in connection with said unit or any part thereof, and all water-rights, rights-of-way, ditches, dams, reservoirs, lands, or interest in lands the use and occupancy of which are necessary or appropriate in the maintenance and operation of such unit."

796

"project," but should be treated as though they were not owned by the petitioner at all. The profit should not therefore have been included in that investment, because the lands themselves should not have been. The issue seems to have arisen in such a way that justice requires that an opportunity be given to the petitioner to prove what part of the lands were "non-project" lands. The case has not been finally closed, and Miller, the Commission's witness, in his testimony said that he would try to separate "project" from "non-project," lands. Apparently he did so after the hearings were closed, but his report is not in the record. Considering that, as we have said, the Commission's jurisdiction pro tanto depends upon the issue, we do not think that the petitioner should be foreclosed from making its proof, it being understood that the burden is upon it. § 301 (a), 16 U.S.C.A. § 825(a). Alabama Power Company v. Federal Power Comm., supra, 128 F.2d 280 at pp. 295, 296.

The petitioner complains somewhat bitterly of the general result, which, so it says, deprives it of all advantage from the successful outcome of the foresight and courage of its founders—pioneers who, in the face of the most expert advice of the time, have now justified their faith in the possibility of transmitting electrical current over long distances. To deny to such adventurous spirit all but the usual return upon the money originally invested would be, it says, to stifle the very breath of industrial progress. No community can advance in the arts where incentives are not offered for unusual risks and unusual daring, if they succeed. We have, however, nothing to do with such considerations; they are for congress, to which alone is given power to measure and balance conflicting economic interests. How far in the end it will dampen progress to hold down the profits of those who greatly venture; how far—if it does—the resulting gains to consumers will not balance the loss: these issues are plainly not for judges, who indeed are not well qualified to deal with them, even if that were within their powers.

Except as to any inclusion of "non-project" lands the orders will be affirmed.

AUGUSTUS N. HAND, Circuit Judge (concurring).

I entirely agree with the result reached by my brethren and should add nothing were it not for the fact that they express the view that the words "original cost" are to be limited to cost to the first investor in the power project. I seriously doubt whether such a view was ever in the mind of Congress when it employed the words "original cost" and I think, if applied in other cases, it would be so damaging to many investors in water power projects that it should not be adopted without clearer warrant than I can find and certainly not without argument, owing to the serious results involved in such a construction of the statute, which it has never received.

Moreover, the view suggested is, I believe, plainly inconsistent with the "classification of investment in road" by the Interstate Commerce Commission which the Commission embodied in Regulation 103.41 pursuant to Section 3(13) of the Power Act, 16 U.S.C.A. § 796(13). Indeed this is virtually admitted in the opinion of the majority, who avoid the difficulty only by concluding that 103.41 should not be read as incorporated in the Power Act by Section 3(13).

The cost to the present owners is impliedly recognized as a proper factor in Opinion No. 77 of the Commission when it gives its reasons for rejecting the 1918 write-ups in the case at bar. It says: "While we recognize the significance to be attached to the values finally agreed upon in a transaction between unaffiliated parties who have bargained extensively at arms length, we cannot agree with Licensee's contention under the facts here presented." In other words, the Commission would apparently have allowed the present proprietor the cost to it less deductions for such items as good-will if there had been satisfactory evidence that it made a prudent investment at arms length and that its investment did not consist of securities distributed among various participants that had been issued without satisfactory proof of value. As there was no satisfactory proof that the securities represented cost to the present proprietor it was properly driven back to the cost to its predecessors.

Though "original cost" is not an altogether clear or happy phrase, I am not persuaded that it only refers to the first investor and does not include a present proprietor of a project who has paid a price that did not include any nuisance value or capitalized speculative future revenues based on good-will, but only a cap-

italization based on a fair return from an investment made at arms length. Only by this interpretation of Section 14 of the Power Act providing that the net investment of a licensee "shall not include or be affected by * * * good will, going value, or prospective revenues * * *" can it have any meaning.

It is difficult to see why Sections 14 and 20 should have required deduction of going concern, good-will and prospective revenue values if such values played no part in the determination of the net investment described in Section 3(13) as "the actual legitimate original cost thereof as defined and interpreted in the 'classification of * * * road * * *, issue of 1914, Interstate Commerce Commission.' " Only by the most awkward draftsmanship could Congress have sought by Section 14 to reinforce the definition of Section 3(13) by excluding items not included in net investment under the terms of Section 3(13).

The expression "prospective revenues" is one familiar to rate litigation, and in view of the fact that, for rate making purposes prospective revenues should not and logically cannot be used to fix a fair return, has not been thought to involve the corollary that the rate base to a purchaser must either be zero or the cost to the original builder. By defining "net investment" in terms of the I. C. C. investment classification, Congress has apparently established original cost to the licensee as the valuation base, and Section 14, quite consistently modifies this investment base by the deduction of elements of value which are not regarded as appropriate to rate fixing. Good-will, going concern and prospective earnings values are the difference between what an investor will pay for a particular enterprise and the cost of providing the equal of its tangible assets. The latter factor is not harder to determine than reproduction cost, the ascertainment of which is familiar to rate cases, and, indeed, required by Congress in railway valuations. 49 U.S.C.A. § 19a.

It is not suggested that the foregoing interpretation would allow a succeeding purchaser a return based on the production value of his plant. The allowable basis for his return is only the net investment he has made so far as it does not exceed reproduction cost.

It is true that certain verbal inconsistencies between Sections 3(13) and 14 may exist, as is noted in the opinion of the majority, but the interpretation I suggest apparently reconciles any there may be and is fortified both by the general practice in rate making under analogous federal statutes and by what seems to have been the view of the Commission expressed in the words already quoted from its Opinion 77.