Opinion for the Court filed by Circuit Judge SENTELLE.
SENTELLE, Circuit Judge:
This is a petition for review by the Association of American Railroads (“AAR”) of the revenue adequacy determinations of the Interstate Commerce Commission (“ICC” or “Commission”) for 1988[1] and 1989.[2] The issue before us is whether the Commission’s decision to adopt acquisition cost valuation in computing railroad revenue adequacy, rather than continuing to use original cost valuation, was rational and lawful. Because the ICC has presented a reasoned explanation for its change in policy, we decline to substitute our judgment for the Commission’s. We therefore affirm the Commission’s modifications in valuating the railroads’ investment bases.
I
Pursuant to Congress’s direction that it develop standards to determine adequate railroad revenue levels and assist carriers in attaining them, 49 U.S.C. § 10704(a)(2) (1988), the ICC determines which railroads are attaining an adequate level of revenues on an annual basis. 49 U.S.C. § 10704(a)(3), (4). Revenues are deemed adequate when a railroad earns a rate of return on its investment at least equal to the current cost of capital, i.e., the market cost of debt and equity, otherwise understood as the “minimum necessary to attract and maintain capital in the railroad ... industry.” Standards For Railroad Revenue Adequacy, 364 I.C.C. 803, 809-10 (1981), aff'd, Bessemer & Lake Erie R.R. Co. v. ICC, 691 F.2d 1104 (3d Cir.1982), cert. denied sub nom. Western Coal Traffic League v. United States, 462 U.S. 1110, 103 S.Ct. 2463, 77 L.Ed.2d 1340 (1983).
To calculate revenue adequacy, the Commission divides a carrier’s net railway operating income by its net investment base to determine its return on investments for that year. It then compares the railroad’s return on investment with the industry's cost of capital for that year. When the cost of capital exceeds the return on investment, the carrier is deemed revenue inadequate. The more a railroad’s net investment base shrinks relative to its net operating income, the greater the likelihood that a railroad will be found to be revenue adequate.
Notwithstanding the pejorative connotations inherent in the term, a determination of “revenue inadequacy” is generally advantageous to a carrier. Such a finding permits a railroad to raise its rates without regulatory scrutiny by as much as 4% above the rate of inflation each year. 49 U.S.C. § 10707a(d)(1), (3), (e). In addition, revenue adequacy is a factor in ICC assessment of the reasonableness of any railroad rates the agency reviews.
In calculating revenue adequacy for 1988, the ICC identified five proposed computational adjustments to its revenue adequacy standards. Only one of these is at issue here: the proposal to evaluate railroad assets acquired from other railroads based on their “acquisition cost” (cost to the acquirer) rather than on their “original” or “predecessor” cost (book value to the seller). The latter represents the costs to the railroads when assets are first dedicated to public service by the seller and allows the seller’s book value to be carried over to its successor, while the former is defined as the fair market value of an asset as established by its purchase price when acquired and as shown on the seller’s railroad books, less depreciation. 1988 Determination, 6 I.C.C.2d at 164 & n. 3. Under acquisition costing, the purchasing carrier will report its own higher value when it acquires another’s property for a price in excess of the seller’s book value; converse *243 ly, when the purchaser pays less than the seller’s book value, the purchaser’s net investment base will reflect its lower value. Id. at 935 n. 3.
Because economic conditions in the railroad industry affect the value of railroad assets, a net investment base calculated by acquisition costs will often be smaller than one calculated using original cost. The ICC issued tentative 1988 revenue adequacy determinations for potentially affected carriers pending a final decision on whether to adopt the proposed revisions.
One carrier, some shipper groups, and the AAR filed comments on the proposed computational adjustments, and the ICC subsequently resolved several of the disputed issues. Having recomputed revenue ádequacy for 1988, the Commission ultimately found two of the fifteen railroads with operating revenues of $50 million or more to be revenue adequate. Revenue Adequacy — 1988 Determination, 6 I.C.C.2d 933, 55 Fed.Reg. 32318 (Aug. 8, 1990) (C.L. 88-10) (“1988 Determination”). Despite the introduction of the new valuation methodology, the two carriers affected by the use of acquisition cost rather than original cost were deemed revenue inadequate in 1988. Id. at 951.
The following year, the ICC found two carriers to be revenue adequate. Railroad Revenue Adequacy — 1989 Determination, 7 I.C.C.2d 158, 55 Fed.Reg. 48177 (Nov. 19, 1990) (C.L. 89-1) (“1989 Determination ”). In granting AAR’s motion for reconsideration, the ICC agreed to review the investment base valuation issue, but ultimately refused to amend its methodology. 1989 Determination, 7 I.C.C.2d 580, 585 (1991) (C.L. 89-8). AAR petitioned this Court for review of the 1988 and 1989 determinations, both of which utilized the acquisition cost valuation.
II
We note at the outset that our role in reviewing agency regulations or modifications thereof is a limited one. This Court is not to inquire as to whether the agency’s decision is wise as a policy matter; indeed, we are forbidden “from substituting [our] judgment for that of the agency.” Ethyl Corp. v. EPA, 541 F.2d 1, 34 (D.C.Cir.) (en banc), cert. denied sub nom. E.I. du Pont de Nemours & Co. v. EPA, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976). Rather, we must affirm unless the regulations are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (1966); United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 749, 92 S.Ct. 1941, 1947, 32 L.Ed.2d 453 (1972). We presume the agency’s action is valid. ICC v. Jersey City, 322 U.S. 503, 512, 64 S.Ct. 1129, 1133, 88 L.Ed. 1420 (1944); Ethyl Corp. v. EPA, 541 F.2d at 34.
This “highly deferential” standard would not permit us to substitute our judgment for that of the agency. We may vacate the ICC’s decisions if the agency “has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before an agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.” Motor Vehicle Mfrs. Ass’n v. State Farm Mutual Auto Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). Indeed, because Congress has specifically delegated the responsibility to develop revenue adequacy standards to the ICC, 49 U.S.C. § 10704(a)(2), the Commission here is operating “at the zenith of its powers.” Central and Southern Motor Freight Tariff Ass’n v. United States, 777 F.2d 722, 729 (D.C.Cir.1985) (citing Batterton v. Francis, 432 U.S. 416, 425-26, 97 S.Ct. 2399, 2405-06, 53 L.Ed.2d 448 (1977)).
When, as in the present matter, the Commission revises or even reverses previous rules rather than promulgating new ones, deference nonetheless remains in order, so long as the Commission presents a reasoned analysis supporting its action. Center For Science v. Department of Treasury, 797 F.2d 995, 999 (D.C.Cir.1986) (citing Motor Vehicle Mfrs. Ass’n v. State Farm, 463 U.S. at 42, 103 S.Ct. at 2866). *244 We find that the ICC did indeed make a rational choice between conflicting policy alternatives.
Ill
At the heart of the AAR’s challenge to the ICC’s valuation modifications as arbitrary and capricious is the claim that acquisition costing is inconsistent with the Interstate Commerce Act’s mandate that revenue levels be established adequate to permit railroads to earn “a reasonable and economic profit or return (or both) on capital employed in the business.” 49 U.S.C. § 10704(a)(2).
First, the AAR contends that acquisition cost valuation will both deny railroads capital return sufficient to meet public demand for rail service and prevent carriers from recovering adequate depreciation charges. Without an “objective starting point” such as original cost for valuation, the AAR contends, a “vicious cycle” may emerge. Under this scenario, regulation would restrain earnings which would be reflected in carriers’ market prices — the basis for acquisition costing — and become the means of establishing an ever-lower investment base for regulatory purposes, thereby creating a “one-way downward ratchet.” AAR Comments at 17-19.
The AAR further argues that the Supreme Court has rejected the use of current market value as a basis for determining the amount a regulated firm should be allowed to earn because of price spiralling. See FPC v. Hope Natural Gas Co., 320 U.S. 591, 601, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944) (holding that “rates cannot be made to depend on ‘fair value’ when the value of the going enterprise depends on earnings under whatever rates may be anticipated”); Bluefield Waterworks and Improvement Co. v. Public Serv. Comm’n, 262 U.S. 679, 691, 43 S.Ct. 675, 678, 67 L.Ed. 1176 (1923) (citing Minnesota Rate Cases, 230 U.S. 352, 434, 33 S.Ct. 729, 754, 57 L.Ed. 1511 (1913) (holding that “The making of a just return ... involves the recognition of [property's] fair value if it be more than its cost”)); Niagara Falls Power Co. v. FPC, 137 F.2d 787, 794 (2d Cir.) (noting that the “only factor which determines [a power plant’s] price is the ‘prospective revenues’ which it will produce” in affirming the Federal Power Commission’s use of original cost in determining corporation’s net investment for capitalization purposes), cert. denied, 320 U.S. 792, 64 S.Ct. 206, 88 L.Ed. 477 (1943).
Nonetheless, because the Commission has articulated a rational basis for rejecting this argument, we must affirm that rejection. The Commission rationally distinguishes the instant case from the line of public utility rates cases cited as precedent by the AAR.[3] Railroads are not a “heavily regulated utility” and therefore “most rail rates are not subject to maximum rate regulation,” 1988 Determination, 6 I.C.C.2d at 941, which would constantly drive earnings down. The AAR contends, nonetheless, that even if maximum price regulation is not all controlling — as it is with respect to a public utility — certain potentially very profitable routes are so limited. Therefore, even some regulatory limitation on maximum pricing “taints” the Commission policy with circularity. Congress in 49 U.S.C. § 11166 has required the ICC to “prescribe] expense and revenue accounting and reporting requirements consistent with generally accepted accounting principles” and to “promulgate such rules pursuant to *245 accounting principles established by the Railroad Accounting Principles Board” (“RAPB”). Id. In the rule, before us, the ICC did exactly that, relying on the expert views expressed by the RAPB consistent with generally accepted accounting principles as support for its valuation methodology. See 2 RAPB Report 45-48; 1988 Determination, 6 I.C.C.2d at 938-39.
In short, the Commission has made a reasonable predictive judgment as to how railroad investors will respond to its use of acquisition costing and has concluded that a downward price spiral would not occur. Such a prediction is entitled to this Court’s deference. FCC v. National Citizens Comm’n for Broadcasting, 436 U.S. 775, 814, 98 S.Ct. 2096, 2121-22, 56 L.Ed.2d 697 (1978); Southern Pacific Transp. Co. v. ICC, 736 F.2d 708, 720-21 (D.C.Cir.1984), cert. denied sub nom. Kansas City Southern Ry. Co. v. United States, 469 U.S. 1208, 105 S.Ct. 1171, 84 L.Ed.2d 322 (1985).
 Indeed, deference is particularly appropriate where, as here, an agency has sought to make reasonable accommodations to address petitioner’s concerns. The Commission has expressed a willingness to make exceptions to acquisition costing, in accordance with the recommendations of the RAPB, if it can be shown in particular cases that government regulation primarily held down a railroad’s selling price. 1988 Determination, 6 I.C.C.2d at 941. Costing decisions, by the ICC’s own pledge, “will be driven by what is the most accurate and reasonable valuation in each particular case.” Id.
IV
In a distinct but related argument, the AAR charges that by relying on the acquisition costs of potentially undervalued assets as the basis for allowed depreciation, the ICC “eliminates the linkage between underlying asset values and allowed depreciation charges,” and thereby denies railroads the opportunity to earn the revenue sufficient to replace essential assets and make other “prudent capital outlays.” 49 U.S.C. § 10704(a)(2)(A). Use of acquisition cost, according to the AAR, will undermine the integrity of the railroads’ depreciation system. The AAR argues that “[t]he investment base should never be reduced without allowing the railroad some opportunity to recover its capital.”
We find this argument unavailing because the ICC reasonably concluded that acquisition value is “the more current and probative evidence of value arrived at in arms length negotiations.” 1988 Determination, 6 I.C.C.2d at 940-41. The Commission rejected as a “faulty premise” the assumption, inherent in the AAR’s preference for predecessor costs, that “the railroads’ consumable assets were adequately depreciated over the years and that the resultant net book value fairly depicts the age and physical condition of the road property and equipment while factoring in any obsolescence as well.” Id. This judgment was well within the ICC’s purview. Indeed, the ICC identifies a significant inconsistency in the AAR’s position, which would allow railroads to “expense special charges while continuing to value the asset base using old values (i.e. predecessor costs) that have since been written-down as a result of an acquisition or reorganization.” 1988 Determination, 6 I.C.C.2d at 941. Noting that the railroad has changed owners and emerged from sale as “a different entity with different capital requirements than its predecessor,” id. at n. 11, the ICC convincingly argues that it properly focused on the capital ventured by the new owners, rather than on the prior owner’s investment. Furthermore, the ICC credibly suggests that the AAR’s solicitude for new owners unable to fully recover their capital investments is misplaced when the purchasers pay more than book value for sellers’ assets.
V
AAR next argues that acquisition costing produces inconsistent results, because two competing carriers with equivalent assets may be valued differently for regulatory purposes depending upon when one railroad’s assets happen to be acquired. The Commission did not respond specifically to the argument posed as a hypothetical by AAR’s expert, in which an acquired rail *246 road with a revalued investment base achieves a new, higher rate of return and thus incurs a competitive disadvantage visa-vis an unacquired carrier, despite the similarity of their assets and revenues. However, when dealing with particular and not hypothetical financially troubled railroads, the ICC did consider the potential for disparate rates of returns based on different asset valuations, and concluded that acquisition costing did not distort the presentation of earnings in the cases of particular financially troubled railroads. 1989 Determination, 7 I.C.C.2d at 585 (Illinois Central); 1988 Determination, 6 I.C.C.2d at 941 n. 11 (Boston and Maine). We defer to those determinations.
CONCLUSION
Although we have not discussed all the arguments raised by petitioner, we have considered each of them and found them to be without merit. The ICC's determination that acquisition cost valuation both represents an accurate valuation methodology and is consistent with the capital attraction goal of the revenue adequacy proviso of the Interstate Commerce Act, 49 U.S.C. § 10704(a)(2), was neither arbitrary nor capricious. Accordingly, the ICC orders under review are hereby

Affirmed.

. Ex Parte No. 483, Railroad Revenue Adequacy—1988 Determination, 6 I.C.C.2d 163; 6 I.C.C.2d 933 (orders served November 17, 1989 and August 7, 1989).

. Ex Parte No. 489, Railroad Revenue Adequacy—1989 Determination, 7 I.C.C.2d 158; 7 I.C.C.2d 580 (orders served November 16, 1990 and June 7, 1991).

. This distinction allows us to dispense with the AAR’s final argument — that acquisition cost valuation conflicts with decisions of this Court — in short order. This Court has recognized that the agencies governing public utilities are entitled to deference with respect to choices of regulatory techniques and has allowed the agencies great leeway in their selection of valuation methods for rate base purposes. See, e.g., Southwestern Bell Corp. v. FCC, 896 F.2d 1378, 1381 (D.C.Cir.1990) (affirming as within agency discretion an FCC rule permitting telephone utilities to utilize the lesser of market price or book value to evaluate assets purchased from affiliates). We do not find the Commission’s reasoning in the instant case inconsistent with that jurisprudence. Indeed, the AAR itself has argued in an earlier case that the rate principles of the public utility industry should not be applied to railroad revenue adequacy determinations. See AAR Reply Comments, Standards for Railroad Revenue Adequacy, 3 I.C.C.2d 261 (1986).