### SAFE HARBOR WATER POWER CORPORATION v. FEDERAL POWER COMMISSION.

No. 9345.

United States Court of Appeals
Third Circuit.

Argued March 22, 1949.

Decided Dec. 30, 1949.

Randall J. LeBoeuf, Jr., New York City (LeBoeuf & Lamb, and Lauman Martin, Craigh Leonard, New York City, Hull, Leiby and Metzger, and George Ross Hull, Arthur H. Hull, John C. Kelley, Harrisburg, Pa., George T. Hambright, Lancaster, Pa., on the brief), for petitioner.

Charles E. Thomas, Harrisburg, Pa., (Arthur J. Diskin, Assistant Counsel, Lloyd Benjamin, Assistant Counsel, Harrisburg, Pa., on the brief), for Pennsylvania Public Utility Commission, amicus curiae.

Frederick G. Hamley, Washington, D. C., for National Association of Railroad and Utilities Commissioners, amicus curiae.

Charles D. Harris, General Counsel, Baltimore, Md., Public Service Commission of Maryland, amicus curiae.

Reuben Goldberg, Washington, D. C., Bernard A. Foster, Jr., Washington, D.

C. (Bradford Ross, General Counsel, Howard E. Wahrenbrock, Assistant General Counsel, Theodore French, Francis L. Hall, Washington, D. C., on the brief), for Federal Power Commission.

Before BIGGS, Chief Judge, and GOODRICH and O'CONNELL, Circuit Judges.

BIGGS, Chief Judge.

For the second time Safe Harbor Water Power Corporation seeks to review in this court an order[1] of the Federal Power Commission which will reduce the rates which it may charge for electric energy transmitted in interstate commerce. In the instant case the Federal Commission ruled that it possessed the power to regulate Safe Harbor's rates under Section 20, Part I, and also under Sections 205 and 206, Part II of the Federal Power Act and ordered a substantial rate reduction.[2]

The circumstances of Safe Harbor's operations are referred to in our earlier opinion, 3 Cir., 124 F.2d 800, certiorari denied 316 U.S. 663, 62 S.Ct. 943, 86 L.Ed. 1740, and need not be detailed here. It will be necessary to read that opinion in conjunction with this. We think it is sufficient presently to state that we held in our earlier opinion that the Commission was without jurisdiction to regulate Safe Harbor's rates under Section 20, Part I of the Federal Power Act, because it had not found that the States of Pennsylvania and Maryland were unable to agree through their properly constituted authorities on the rates to be charged by Safe Harbor for the sale of the electric energy generated and transmitted by it in interstate commerce wholesale. The Commission had not relied upon Part II of the Federal Power Act in its earlier proceedings and the provisions of that Part were not before us. We now hold that the Federal Commission possesses the power to regulate Safe Harbor's rates under the provisions of Part II of the Federal Power Act and that the Commission in making 'the regulatory order of November 4, 1946, employed a rate base formula authorized by the Federal Power Act and has allowed Safe Harbor a fair rate of return.

I. Applicable Statutory Provisions and Jurisdiction.

■ A. *Did the Federal Commission have jurisdiction under Part II of the Federal Power Act to regulate Safe Harbor's rates and is Section 20, Part I, inconsistent with or repealed by implication by Part II?* Repeals by implication are not favored. United States v. Jackson, 302 U.S. 628, 631, 58 S.Ct. 390, 82 L.Ed. 488; United States v. Borden Company, 308 U.S. 188, 198, 60 S.Ct. 182, 84 L.Ed. 181. Safe Harbor holds a fifty year license issued by the Commission on April 22, 1930, under Section 4(e) of the Federal Water Power Act of 1920.[3] The provisions of Parts II and III of the Federal Power Act did not become effective until August 26, 1935.[4] Section 28 of the Federal Water Power Act, incorporated without change into the Federal Power Act as Section 28, Part I,[5] provided that though the right to alter,

1. The first order was filed by the Federal Commission on June 11, 1940 and was set aside by the order of this court. See 124 F.2d 800. The order in the instant case was filed November 4, 1946. The Commission denied rehearing by an order issued December 24, 1946 and in the order denying rehearing made certain changes in its opinion which need not be discussed.

2. The 1935 Federal Power Act, 49 Stat. 863, 16 U.S.C.A. § 791(a) et seq., Part I of which is the 1920 Federal Water Power Act, as amended 41 Stat. 1063–1077, 41 Stat. 1353, 46 Stat. 797.

3. 41 Stat. 1065–1066.

4. By Title II of the Public Utility Act of 1935, approved August 26, 1935, 49 Stat. 838, 16 U.S.C.A. §§ 791a–825r, the original Federal Water Power Act was made Part I of the "Federal Power Act" and Parts II and III added to that Act. Part II vests in the Commission jurisdiction over the interstate transmission of electric energy and public utility companies engaged therein. Part III relates to such public utility companies and also to licensees and carries the administrative and procedural provisions of the Federal Power Act.

5. Section 28 of the Federal Power Act provides "That the right to alter, amend, or repeal this Act is hereby expressly reserved;

amend or repeal the provisions of the Act was expressly reserved by Congress no alteration, amendment or repeal should affect any license issued under the Act or the rights of licensees thereunder. Section 20 of the Federal Water Power Act, incorporated without change as Section 20, Part I, of the Federal Power Act, provided "That when said power or any part thereof shall enter into interstate or foreign commerce the rates charged and the service rendered by any such licensee, or by any subsidiary corporation, the stock of which is owned or controlled directly or indirectly by such licensee, or by any person, corporation, or association purchasing power from such licensee for sale and distribution or use in public service shall be reasonable, nondiscriminatory, and just to the customer and all unreasonable discriminatory and unjust rates or services are hereby prohibited and declared to be unlawful; and whenever any of the States directly concerned has not provided a commission or other authority to enforce the requirements of this section within such State or to regulate and control the amount and character of securities to be issued by any of such parties, or such States are unable to agree through their properly constituted authorities on the services to be rendered, or on the rates or charges of payment therefor, or on the amount or character of securities to be issued by any of said parties, jurisdiction is hereby conferred upon the commission, upon complaint of any person aggrieved, upon the request of any State concerned, or upon its own initiative to enforce the provisions of this section, to regulate and control so much of the services rendered, and of the rates and charges of payment therefor as constitute interstate or foreign commerce and to regulate the issuance of securities by the parties included within this section, and securities issued by the licensee subject to such regulations shall be allowed only for the bona fide purpose of financing and conducting the business of such licensee.

"The administration of the provisions of this section, so far as applicable, shall be according to the procedure and practice in fixing and regulating the rates, charges, and practices of railroad companies as provided in the Act to regulate commerce, approved February 4, 1887, as amended, and that the parties subject to such regulation shall have the same rights of hearing, defense, and review as said companies in such cases.

"In any valuation of the property of any licensee hereunder for purposes of rate making, no value shall be claimed by the licensee or allowed by the commission for any project or projects under license in excess[6] of the value or values prescribed in section 14 hereof for the purposes of purchase by the United States, but there shall be included the cost to such licensee of the construction of the lock or locks or other aids of navigation and all other capital expenditures required by the United States, and no value shall be claimed or allowed for the rights granted by the commission or by this Act."

Section 14 of the Federal Water Power Act with minor amendments became Section 14, Part I, of the Federal Power Act. It is set out in the footnote.[7] Section 14,

but no such alteration, amendment, or repeal shall affect any license theretofore issued under the provisions of this Act, or the rights of any licensee thereunder."

6. Emphasis added throughout this opinion except where otherwise noted.

7. Section 14, Part I, provides:

"Upon not less than two years' notice in writing from the commission the United States shall have the right upon or after the expiration of any license to take over and thereafter to maintain and operate any project or projects as defined in section 3 hereof, and covered in whole or in part by the license, or the right to take over upon mutual agreement with the licensee all property owned and held by the licensee then valuable and serviceable in the development, transmission, or distribution of power and which is then dependent for its usefulness upon the continuance of the license, together with any lock or locks or other aids to navigation constructed at the expense of the licensee, upon the condition that before taking possession it shall pay the net investment of the licensee in the project or projects taken, not to exceed the fair

containing the so-called "recapture"[8] provisions, Part I, relating only to licensees, refers to "net investment" as an element going to fix the recapture base of a hydroelectric property and provides that in any event the United States on recapture shall not pay more than the "fair value" of the property. Section 3(11) of the Federal Water Power Act, in effect reenacted as Section 3(13) of the Federal Power Act (albeit with amendments not pertinent here), provided originally and provides now that " 'net investment' in a project means the actual legitimate original cost thereof as defined and interpreted in the 'classification of investment in road and equipment of steam roads, issue of 1914, Interstate Commerce Commission', plus similar costs of additions thereto and betterments thereof, minus the sum of the following items properly allocated thereto, if and to the extent that such items have been accumulated during the period of the license from earnings in excess of a fair return on such investment: (a) Unappropriated surplus, (b) aggregate credit balances of current depreciation accounts, and (c) aggregate appropriations of surplus or income held in amortization, sinking fund, or similar reserves, or expended for additions or betterments or used for the purposes for such reserves were created. * * *" It is the contention of Safe Harbor, as will more particularly appear hereinafter, that since Section 20 refers to "net investment", the net investment of Safe Harbor must be determined in accordance with the formula

of Section 3(13) set out immediately above. This, says Safe Harbor, the Federal Commission failed to do.

The foregoing gives us only part of the background of our problem. As we have stated Safe Harbor is a "licensee" under the Federal Water Power Act, now Part I of the Federal Power Act. But is it also a "public utility" under Part II? A "public utility" is defined in Section 201(e), Part II, as " * * * any person who owns or operates facilities subject to the jurisdiction of the Commission under this Part". Section 201(b) in pertinent part describes such facilities as those employed for "the transmission of electric energy in interstate commerce * * *." The Federal Commission has found on evidence which admits of no serious dispute, that Safe Harbor owns and operates the prescribed jurisdictional facilities. See 5 F. P.C. at pp. 226–229. See Jersey Central Federal Power & Light Co. v. Federal Power Comm., 319 U.S. 61, 63 S.Ct. 953, 87 L.Ed. 1258. Section 201(c) provides that "electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof * * *." Section 201(d) states that the term "sale of electric energy at wholesale" shall mean "a sale of electric energy to any person for resale." It cannot be disputed that Safe Harbor makes such jurisdictional sales and the Commission has so found on very adequate evidence.[9]

---

value of the property taken, plus such reasonable damages, if any, to property of the licensee valuable, serviceable, and dependent as above set forth but not taken, as may be caused by the severance therefrom of property taken, and shall assume all contracts entered into by the licensee with the approval of the commission. The net investment of the licensee in the project or projects so taken and the amount of such severance damages, if any, shall be determined by the Commission after notice and opportunity for hearing. Such net investment shall not include or be affected by the value of any lands, rights-of-way, or other property of the United States licensed by the Commission under this Act, by the license or by good will, going value, or prospective

revenues; nor shall the values allowed for water rights, rights-of-way, lands, or interests in lands be in excess of the actual reasonable cost thereof at the time of acquisition by the licensee: *Provided,* That the right of the United States or any State or municipality to take over, maintain, and operate any project licensed under this Act at any time by condemnation proceedings upon payment of just compensation is hereby expressly reserved."

8. The word "recapture" is employed by the Commission and by the parties albeit the taking over by the United States of hydroelectric projects under Section 14 would be in fact a *first* taking.

9. As we pointed out in our earlier opinion, 124 F.2d at page 802, Safe Harbor's out-

Safe Harbor then is not only a *licensee* under Part I but it is also a *public utility* under Part II of the Federal Power Act. Section 201(a), Part II, declares the congressional policy in respect to public utilities as follows: " * * * the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and * * * Federal regulation of matters relating to generation to the extent provided in this Part and the Part next following and of that part of such business which consists of the transmission of electric energy, in interstate commerce * * * is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States."

Section 205(a) provides that "All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just

and reasonable is hereby declared to be unlawful."

Section 206(a) states, "Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order."

Section 208(a) provides that "The Commission may investigate and ascertain the actual legitimate cost of the property of every public utility, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation, and the fair value of such property."

The argument favoring repeal by implication,[10] or, perhaps more accurately,

---

put is delivered to an integrated interstate electric system under the terms of the so-called "1931 contract", two-thirds of the energy being sold to the Maryland Company and the remaining one-third going to the Pennsylvania Company. The Commission has correctly stated, "The sales are sales for resale", 5 F. P. C. at p. 235. They constitute in fact wholesale sales in interstate commerce.

10. We use the words "repeal by implication" as a "shorthand" phrase in this opinion for the sake of brevity. Section 212 of the Public Utility Act of 1935, 49 Stat. 847, specifically provides that "Sections 1 to 29, inclusive, of the Federal Water Power Act, as amended, shall constitute Part I of that Act * *." Section 213, provides that "The Federal Water Power Act, as amended, is further amended by adding thereto the following parts * * * ." There follow Parts II and III being specifically designated in Section 320 as the "Federal Power Act". Sections 13, 20 and 28 of the Federal Water Power Act were left unchanged by the Public Utility Act of 1935 and

were merely constituted part of Part I of the Federal Power Act by Section 212 of that Act, and Section 3 (11), now 3 (13) of the Federal Power Act, and Section 14 of the Federal Water Power Act were amended in respects not material here by the Public Utility Act of 1935. Perhaps, therefore, the term "repeal by implication" is not entirely appropriate. It would seem to be more accurate to state that certain portions of Parts I and II are inconsistent with each other unless, we, or some other court, find a rational reconciliation as we think we have done. If the provisions of the respective Acts cannot be reconciled then the former must be deemed to be repealed by the latter. Cf. our earlier opinion, 124 F.2d at pages 803–804. We held that Section 313(b) vesting the power to review decisions of the Federal Commission in the respective Courts of Appeals were so inconsistent with those of Section 20 which were deemed to provide for the review of such an order by a three-judge district court under the Urgent Deficiencies Act, October 22, 1913,

the reasoning supporting the existence of such inconsistency between the regulatory provisions of Section 20, Part I, and Part II as to require the discarding of the former for the latter, runs as follows. Since Safe Harbor is a "public utility" it is regulable under Part II though it is also a "licensee" under Part I. The language of Part II, Sections 205, 206 and 208 therefore must be deemed to provide the sole regulatory formula. But the *contra* argument is said to require the conclusion that if a hydroelectric project is a "licensee" under Part I, as is Safe Harbor, it must be regulable under Section 20. If Section 20 be used it is asserted the unique "net investment" formula of Section 3(13) implemented by Section 14, the "recapture" section of Part I, must also be employed.

It is contended by Safe Harbor that this is so because the base for rate making or recapture is a single financial arrangement with the licensee. "Net investment", says Safe Harbor, must be the same element whether employed as a base to determine the rate of return or the amount to be paid on recapture. This was orally argued by counsel for Safe Harbor in the following terms: "Congress determined that these two subjects of rate making and recapture were inseparably part of a single financial agreement with the licensee; and the reason for that is a very simple one—that the higher the rates, [sic] if the licensee gets excessive rates under the recapture formula of Section 14, it serves to reduce the recapture price, so that the two are naturally connected."

Going on with Safe Harbor's argument, it contends that since Section 206, Part II, contains no such formula as that set out

in Section 3(13), regulation under Section 206 must be on a different basis from that required by Section 20. Therefore Section 20 must prevail. The proponents of repeal by implication or fatal inconsistence assert that the provisions of the respective sections are incompatible and that one must give way to the other.

■ Sections 205, 206 and 208 are in fact a later statutory enactment than Section 20 but we do not find the argument in favor of repeal by implication persuasive. As we have seen, Sections 20 and 28 were simply constituted a part of the Federal Power Act by Section 212 of the Public Utility Act of 1935 and Section 213 of the latter Act states, "The Federal Water Power Act, as amended, is further amended by adding thereto the following parts * * *"; then follow Parts II and III of the Federal Power Act. But Section 3(11), now Section 3(13) of the Federal Power Act, and Section 14 of the Federal Water Power Act were reenacted by the Public Utility Act of 1935 albeit amended in parts not pertinent here. See note 10, *supra*. It can be argued with some plausibility therefore that since Safe Harbor is a "licensee" it must be regulated as such even though it is also a "public utility". But under the view which we take it is not necessary to resolve these questions for we are of the opinion that the provisions of Section 20, Part I, and those of Sections 205, 206 and 208, Part II, are not conflicting or inconsistent.

Our reasons are as follows: First, we point out that the regulatory language contained in Section 20 is substantially identical in effect, the provisions of Section 3(13)

c. 32, 38 Stat. 208, Sections 41 (subdivision 28), 43–48, of former Title 28, as to require the conclusion that the later enactment repealed the earlier by necessary implication. We then, as now, were faced with the duty of reconciling apparently inconsistent provisions of the Federal Power Act. The question as to which tribunal shall review an order of the Commission is very largely a procedural distinction and, as the Commission points out procedural changes may be effected without consent of the "licensee".

Pennsylvania Power & Light Co. v. Federal Power Commission, 3 Cir., 139 F.2d 445, certiorari denied 321 U.S. 798, 64 S.Ct. 938, 88 L.Ed. 1086.
We are aware that high authority takes an opposing view and asserts that the provisions of Section 20, Part I, are irreconcilable with those of Sections 201, 205 and 206, Part II, and that Section 20 has been repealed by implication. See for example, Benton, "Jurisdiction of F. P. C. and State Agencies", 14 Geo.Wash.L.Rev. 78 (1945).

aside, with that of Section 206.[11] Second, Section 20 expressly provides that in the valuation of the property of any licensee for purposes of rate making " * * * no value shall be claimed by the licensee or allowed by the commission for any project * * * under license *in excess* of the value * * * prescribed in section 14 hereof for the purposes of purchase by the United States * * * ". In other words the reference to Section 14 and *via* Section 14 to the "net investment" provision of Section 3(13) provides a limit for valuation and cannot be construed as a grant of power to make a valuation. Third, it will be observed that if regulation of rates be had under Section 20 of Part I that such regulation conceivably may be by State commissions, whereas recapture must always be by the United States. The United States on exercising its recapture powers under Section 14 at the end of the license period will be required to pay the "net investment" of the licensee in the project taken but "not to exceed the fair value of the property taken." "Net investment" therefore may exceed "fair value". "Net investment" may be determined by State commissions but "fair value" must be determined by the United States and the two elements need not be the same though they should coincide. If State commissions, for example, should allow too high a "net investment", applying the Section 3(13) formula, the United States would not be bound by such a determination though the figures have been set throughout the entire operative period of the license. The United States on recapture would pay merely "fair value". Moreover, the argument of Safe Harbor, both on its brief and as made orally, the latter being quoted at an earlier point in this opinion, that the subjects of rate making and recapture are "inseparably part of a single financial agreement with the licensee" will not hold water. As we endeavor to point out under "II" of this opinion, dealing with rate base, "net investment" as conceived of by Safe Harbor under the Section 3(13) formula must inevitably result in a rate in excess of a "fair return". This is so because under the view taken by Safe Harbor depreciation is not deducted from rate base. We conclude, and we elucidate our reasons at a later point hereinafter, that if Congress intended such a result it would have made that intention manifest in unmistakable terms in the language of Section 20 and would not have used the "in excess" phrase relating to value as prescribed in Section 14. Section 28 does not require a different conclusion. That section does not confer upon the licensee a right to an excessive rate of return or sustain a charge that the Commission in the instant case has in effect changed the rules relating to ascertainment of rate base in the middle of the game. The present pertinent provisions of Section 20 have remained unchanged since 1920. Fourth and last, while Safe Harbor lays great emphasis upon the last clause of Section 201(a) which provides that federal regulation is " * * * to extend only to those matters which are not subject to regulation by the States.", this language is not pertinent in the instant controversy for it is designed to be applicable only to electric energy transmitted and sold in intrastate commerce. The control of rates referred to in the section is control by a single State and the language has no relation to possible joint control by two or more States under the compact clause of the Constitution.[12]

We are of the opinion that the view which we have expressed is not in violation of the Fifth Amendment. It is our duty to reconcile the provisions of the Federal Power Act with those of the Constitution of the United States and we think that

---

11. Section 20 provides that the sale and distribution or use of electric energy " * * * shall be reasonable, nondiscriminatory, and just to the customer * * * ", Section 206 provides that the rate or charge for electric energy if " * * unjust, unreasonable, [or] unduly discriminatory * * * " is subject to regulation by the Commission.

12. Cf. Public Utilities Comm. of Rhode Island v. Attleboro Steam and Electric Co., 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549. See Pennsylvania Gas Co. v. Public Service Comm., 252 U.S. 23, 40 S.Ct. 279, 64 L.Ed. 434, and Connecticut Light & Power Co. v. Federal Power Commission, 324 U.S. 515.

our solution works a reconciliation of Safe Harbor's franchise, the Federal Power Act and the Constitution.

■ We shall presently hold, as appears from heading "I. B." of this opinion, that the Federal Commission has properly found that the States of Pennsylvania and Maryland have been unable to agree on cooperative regulation of Safe Harbor's rates. Conceding that regulation under Part I, whether conducted by the Federal Commission or State Commission, is identical in scope and that the Federal Commission cannot regulate electric energy which the States cannot regulate under the compact clause, clause 3 of Section 10 of Article I of the Constitution, nonetheless, since regulation under Section 20 *sans* the "net investment" base of Section 3(13) is or should be substantially identical with regulation by the Federal Commission under Section 206 because of the similarity of regulatory language of Sections 20 and 206, it seems only an academic question whether regulation be conducted by the Federal Commission to require that the sale and distribution or use of electric energy "* * * shall be reasonable, nondiscriminatory, and just to the customer"[13] (Section 20) or by the Federal Commission in such way that the rate or charge for electric energy may be regulated if it is "* * * unjust, unreasonable [or] unduly discriminatory". If, as we have held, the provisions of Section 206 properly are to be read in the light of Section 20 in fact making the provisions of Section 20 (*sans* the "net investment" language of Section 3(13) ), the equivalent of those of Section 206, the rights of Safe Harbor as a licensee are preserved, the requirements of Section 28 are met and regulation of Safe Harbor's rates may proceed upon such a fair and equitable basis as the Federal Commission may determine. See Federal Power Comm. v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333. In other words we read Section 206

as if the provisions of Section 20 were a part of it.

We appreciate the fact that our construction of the provisions of Section 20 is at variance with the dicta of two courts. See Niagara Falls Power Co. v. Federal Power Commission, 2 Cir., 137 F.2d 787, 792–793, certiorari denied 320 U.S. 792, 64 S.Ct. 206, 88 L.Ed. 477, and Alabama Power Co. v. Federal Power Commission, 75 U.S.App. D.C. 315, 128 F.2d 280, 293, certiorari denied 317 U.S. 652, 63 S.Ct. 48, 87 L.Ed. 525. Our first opinion squints in the same direction. But as Judge Learned Hand stated in the Niagara Falls Power Company case, 137 F.2d at page 795, in construing the Federal Power Act, "* * * it is necessary * * * to break through the band of verbal logic at its weakest spot. * * *" Cf. Metropolitan Edison Co. v. Federal Power Commission, 3 Cir., 169 F.2d 719, 723. The "fair value of the property" provision of Section 14, however, will supply an upward limit and whatever may be found to be the Section 3(13) "net investment" base the property can be recaptured by the United States at its "fair value". We are faced with the practical task of construing Acts of Congress. We can perceive no grave dichotomy in using the provisions of Section 3(13) for recapture and not employing them in arriving at a rate base.

We point out that Safe Harbor's license casts but little light on the problem of rate regulation. An examination of the license and the rules and regulations promulgated by the Commission tend to support the Commission, or at least, serve to show that the Commission's general conception of its rate-making power has been consistent. Article 1 of the license provides that the project "* * * shall be subject to all the terms and conditions of this license, including the terms and conditions of the Act and of the rules and regulations of the Commission pursuant thereto and made a part of this license". Article 26 provides

13. The word "customer" is not defined in Part I and though it may possess some connotation of a small local consumer who uses electricity in his home, giving the phrase its ordinary meaning it is certainly broad enough to include the

Pennsylvania Company or the Maryland Company to which Safe Harbor's electric energy is dispensed.

See the definition of the word "customer", Webster's New International Dictionary, 3rd Edition.

that the licensee shall abide by such reasonable regulation of services and rates as are prescribed by state agencies or by the Federal Commission when it has jurisdiction. Article 23 contains language somewhat like that of Section 3(13), Part I, of the Federal Power Act but that article deals with amortization as required under Section 10(d) of the Federal Power Act. Regulation 17 (Section 2D) of the rules and regulations of the Commission makes it clear that the determination of net investment and rate of return for purposes of amortization shall not be construed as limiting rate-making proceedings. This regulation is specifically referred to in Article 23 of the license. We do not assert that amortization and depreciation are the same coin. But no other article is even remotely analogous here. Since the license contains no limitations on rate-making authorities not to be found in the Federal Power Act itself, we need not concern ourselves further with the provisions of the license.

B. *Was the Federal Commission entitled to regulate Safe Harbor under Part I of the Federal Power Act?* Because of our rulings under heading "I. A." of this opinion this question has become academic. We think we should resolve it, however, because the reviewing Court may take a view of the substantive law which differs from our own. Under heading "I. A." we held that regulation of rates under Section 20 was substantially the same as regulation under Section 206 and that regulation under Section 206, because Safe Harbor is a licensee under Section 4, must be exercised with due regard to the provisions of Section 20. In our earlier opinion we

held that the Federal Commission was without jurisdiction to regulate Safe Harbor's rates as provided in its earlier order [14] because it had failed to make a finding that the States of Pennsylvania and Maryland were " * * * unable to agree through their properly constituted authorities on the services to be rendered, or on the rates or charges of payment therefor * * * ". Our actual ruling went no further than this. See 124 F.2d at pages 805–809. Certiorari was denied on April 6, 1942, 316 U.S. 663, 62 S.Ct. 943, 86 L.Ed. 1740. For more than two years the Federal Commission took no steps and nothing was accomplished by either the Pennsylvania or the Maryland Commissions.

On May 23, 1944, the Public Service Commission of Maryland began an investigation of rates charged by the Maryland Company. Hearings commenced on June 6, 1944. While this investigation was going on, *viz.,* on June 27, 1944, the People's Counsel acting for the Maryland Commission, Counsel for the Mayor and City Council of Baltimore, and certain other parties who need not be enumerated filed a petition with the Maryland Commission asserting that the wholesale rates paid by the Maryland Company to Safe Harbor were unreasonably high, and requested the Maryland Commission to ask the Federal Power Commission to determine the reasonableness of Safe Harbor's rates.

Subsequently, on August 12, 1944 these parties wrote to the Federal Power Commission requesting that the " * * * Commission itself determine these rates and if practicable afford relief by interim orders." The letter is set forth in pertinent part below.[15] Thereafter on August 30,

14. Order of June 11, 1940.

15. "Baltimore, Maryland
August 12, 1944.
"Docket No. IT-5914
Hon. Basil Manly
*Acting Chairman—Federal Power Commission*
Dear Commissioner Manly:
The undersigned are counsel for certain intervenors in an investigation now pending before the Maryland Public Service Commission of the rates for electric service charged by the Consolidated Gas Electric Light and Power Company of Baltimore. The purpose of this letter is to request your Commission to determine, at the earliest convenient date, the just and reasonable wholesale rates charged for electric energy which is sold to the Consolidated Company in interstate commerce by two hydro-electric companies whose plants are located in the State of Pennsylvania, namely, Pennsylvania Water and Power Company and Safe Harbor Water Power Corporation. * * *

1944, the Chairman of the Maryland Commission wrote to the Federal Commission and requested it to proceed to determine the rates to be charged by Safe Harbor. The letter in pertinent part is set forth below.[16] The Maryland Commission, by its

The Mayor and City Council of Baltimore, a municipal corporation of Maryland, is interested in the rates charged by the river companies in two respects and capacities. First, it is one of the largest single consumers of gas and electric energy supplied by the Consolidated Gas Electric Light and Power Company of Baltimore in connection with the lighting of its streets and public buildings. Second, it is deeply concerned with the rates charged to other ratepayers in Baltimore City by that company. Baltimore County has a similar concern with regard to its own consumption and that of its residents.

The investigation here has proceeded to a point where it has become apparent that the rates of the Consolidated Company cannot be effectively determined unless determinations are also made of the just and reasonable wholesale rates at which this Company purchases energy in interstate commerce from the two hydroelectric companies. It also appears that the wholesale rates of these two companies, which have never been regulated, are grossly excessive * * * we beg to call your attention to the fact that in case known as Docket IT 5494, decided June 11, 1940, the Federal Power Commission found the rates of Safe Harbor Water Power Corporation to be excessive. Yet, notwithstanding the considerable time which has elapsed since this finding was made, the ratepayers affected, including the undersigned, have obtained no relief.

On June 27, 1944, People's Counsel for the State of Maryland, an official appointed by the Governor and charged by statute with the duty of representing the interest of the public in cases involving the rates and practices of public utility corporations, formally petitioned the Maryland Public Service Commission to request your Commission to make the rate determination here requested. The undersigned joined in that application. While no order has been passed upon those petitions, we understand informally that joint hearings with regard to these rates are contemplated by the Maryland and Pennsylvania commissions. * * *

*In view of the clearer jurisdiction of the Federal Power Commission and its superior facilities for making these determinations, we respectfully request that the Federal Power Commission itself de-*termine these rates and if practicable afford relief by interim orders.

Respectfully,
(signed) Thomas J. Tingley
　　　　　Assistant City Solicitor
　　　　　Attorney for Mayor and City
　　　　　　Council of Baltimore.
(signed) Michael Paul Smith
　　　　　Attorney for County Commissioners of Baltimore
(signed) Charles C. G. Evans
　　　　　Attorney for Bethlehem-Fairfield Shipyard, Inc.
(signed) John Henry Lewin
　　　　　Attorney for Rustless Iron & Steel Corporation"

"State of Maryland
Public Service Commission,

16. "Docket No. IT-5914 August 30th,
　　　　　　　　　　　　　　　1944

Honorable Basil Manly,
Acting Chairman,
Federal Power Commission,
Dear Mr. Chairman:

As you know, this Commission is engaged in an investigation of the rates charged by Consolidated Gas Electric Light and Power Company of Baltimore which receives large quantities of electric energy from Safe Harbor Water Power Corporation and Pennsylvania Water and Power Company.

In considering a motion by People's Counsel, that this Commission request the Federal Power Commission to determine the reasonable rates to be charged by these two companies for energy supplied to Maryland, we have first inquired into the preparedness of the two state commissions to exercise the regulation indicated by U. S. Circuit Court of Appeals in Safe Harbor Water Power Corporation v. Federal Power Commission.

*While the state commissions are ready to engage in cooperative regulation and the opinion of the Circuit Court indicates state jurisdiction, the public interest demands the procedure which will get results in the shortest possible time and we understand that the Federal Power Commission is prepared to pursue the matter to a conclusion in much less time than probably would be required by state action.*

Under the circumstances, this Commission has decided to grant the motion of People's Counsel and hereby requests

Chairman, stated in this letter that public demanded the regulatory procedure which would "get results in the shortest possible time" and that while the Commissions of both Maryland and Pennsylvania were "ready to engage in cooperative regulation" in accordance with the opinion of this court, the Maryland Commission understood that the Federal Commission was "prepared to pursue the matter to a conclusion in much less time than probably would be required by state action". On September 1, 1944, the day following the receipt of the Maryland Commission's letter, the Federal Commission issued its order instituting the investigation of Safe Harbor's wholesale rates. The Federal Commission based its action "* * * upon consideration of the petition filed on August 31, 1944 by the Maryland Commission * * *" and the "joint petition" [17] filed August 14, 1944, by the intervenors in the Maryland proceeding previously referred to but made no finding that the Maryland Commission and Pennsylvania Commission had been unable to agree on regulation.

Extensive hearings were held. These culminated in the present opinion of the Commission [18] and its order of November 4, 1946, here under review. As we have stated there was no finding by the Federal Commission of jurisdiction over Safe Harbor at the time its order instituting the rate investigation was issued but such a finding was made by the Commission in its opinion. In its opinion in the instant case as we have stated the Commission found that it had jurisdiction to regulate Safe Harbor's wholesale rates both under Section 20, Part I, because the States of Pennsylvania and Maryland had been unable to agree on regulation, and under Part II because electric energy created by Safe Harbor was dispensed by the prescribed jurisdictional facilities in interstate wholesale rates. We agree that the Commission may regulate Safe Harbor's rates but on the theory expressed in "I. A.", *supra.*

The Act, as the Commission points out in its opinion, must be given a reasonable construction and one which will carry out the purpose of Congress to assure adequate and effective regulation of wholesale rates for electric energy in interstate commerce. The Commission stated, 5 F.P.C. at pp. 232–233, that if such rates continue to be too high "inaction by the States involved, after reasonable opportunity [to cooperate in regulation] may show that they are unable to agree as certainly as formal announcement of the fact". The Commission in its earlier opinion of June 11, 1940, 2 F.P.C. 182, had found that the 7% rate of return assured to Safe Harbor under its contract with the Pennsylvania Company [19] was unreasonable. This finding was of course contested by Safe Harbor. As appears at a later point in this opinion under heading "III", this court, like the Federal Commission, is also of the opinion that the rates charged by Safe Harbor are too high. We can perceive no reason why the Commission's finding that the States of Pennsylvania and Maryland are unable to cooperate for the purposes of regulation as provided by Section 20 may not properly be bottomed on a long continued failure of States to cooperate.

But aside from the foregoing, failure to cooperate under the compact clause certainly requires no more formality than cooperation under that clause. Cf. 124 F.2d at page 808. The compact clause does not require the States to embark upon a course of good faith bargaining as is required of

---

that the Federal Power Commission proceed to determine the reasonable rates to be charged by Safe Harbor Water Power Corporation and by Pennsylvania Water and Power Company for energy sold to Consolidated Gas Electric Light and Power Company of Baltimore. * * *
Very truly yours,
/s/ Steuart Purcell,
Chairman."

17. The phrase "joint petition" was used by the Federal Commission in its order of September 1, 1944 to designate the letter set out in note 15, supra.

18. Commissioner Draper dissenting.

19. It will be borne in mind that the Pennsylvania Company sells the electric energy which it purchases to the Maryland Company and to others at wholesale.

the parties to a labor dispute under the National Labor Relations Act. 29 U.S.C.A. § 151 et seq. Refusal of a State to cooperate with another State under Section 20 may be for a good reason or for no reason at all. While the Maryland Commission in some of the correspondence set out in the antecedent footnotes as given lip service to the conception that it and the Pennsylvania Commission might engage in cooperative regulation, the Maryland Commission's letter of August 30, 1944, makes it clear that it had and has no intention of proceeding to cooperate with the Pennsylvania Commission to endeavor to regulate Safe Harbor's rates. Not infrequently that which may be read between the lines of a letter is more potent in carrying conviction than the written words themselves, and in the light of all which transpired before the Federal Commission made the regulatory order presently under review we have no doubt that the Maryland Commission did not wish to cooperate with the Pennsylvania Commission in respect to Safe Harbor's rates. It should be noted, however, that the Pennsylvania Commission has consistently taken the position that it is ready to cooperate with the Maryland Commission.

In addition to the foregoing the Maryland Commission's brief filed in this court states that that consideration of the factors referred to in the brief, which in substance are those set out in the Commission's letters " * * * impelled the decision by the Maryland Commission that it would be impossible for it to join in cooperative regulation with the Pennsylvania Commission".[20] While this statement quoted in full in note 20, supra, was, of course, not before the Federal Commission when it held on November 4, 1946 that Maryland and Pennsylvania were unable to agree on regulation under Section 20, and therefore perhaps the statement may not properly serve as a statement to the Commission of a jurisdictional fact, the statements in the brief fortify the conclusion which both the Federal Commission and this court have reached. Moreover, it will be observed that in the sentence italicized in note 20, supra, and referred to in the beginning of this paragraph, the past tense of the verb "impel" is used and seems to reflect the long continued state of mind of the Maryland Commission. It would be a futile thing to set aside the proceeding of the Federal Commission simply because that tribunal did not have before it the conclusive statements now in the brief of the Maryland Commission. To do so would be to invalidate the proceedings of the Federal Commission for the sake of date on the calendar.[21]

■ In view of the foregoing we have no doubt that the Federal Commission may

20. See pp. 8–9 of the Maryland Commission's brief which state as follows:

"Negotiations with the Pennsylvania Commission looking toward a cooperative procedure were instituted by the Maryland Commission. But little of a tangible nature was accomplished. The interests of Maryland and Pennsylvania were in conflict. The Maryland Commission had no assurance that its role in determining reasonable rates for Safe Harbor would be controlling or even persuasive under such procedure. There were no precedents of cooperation on rate regulation between the two Commissions or elsewhere to afford a guide. Furthermore the Maryland Commission is small, and it felt that it could not carry on its other responsibilities and effectively participate in such an extended joint investigation as would be required. In addition, the Maryland Commission's General Counsel, after consultation with Judge Benton, then counsel to the National Association of Railroad and Utilities Commissioners, raised grave doubts as to the legality of the procedure. In the meantime, People's Counsel and certain intervenors before the Maryland Commission, as above referred to, had directly petitioned the Federal Power Commission to institute an investigation. *Consideration of these factors impelled the decision by the Maryland Commission that it would be impossible for it to join in cooperative regulation with the Pennsylvania Commission.* Accordingly Maryland Commission requested action by the Federal Power Commission."

21. The Maryland Commission's brief was filed in this court on March 14, 1949.

undertake the regulation of Safe Harbor's rates under Section 20, Part I, to the same extent that the Pennsylvania and Maryland Commissions could have done under the compact clause.

## II. Rate Base.

We come then to the questions presented by the instant review which are considered *seriatim* in the letter headings set out under this portion of the opinion.

A. *Has the Federal Commission properly applied the formula of Section 20, Part I of the Act as the provisions of that Section are made applicable by Part II, Sections 205, 206 and 208?* The order of the Federal Commission reduces Safe Harbor's rates by about $630,000 a year setting the corporation's fair return at 5%. Safe Harbor as we have indicated insists that the formula of Section 20 must be read in the light of the provisions of Section 3 (13) relating to "net investment" and in conformity with those of Section 14, the recapture section of Part I. It must be borne in mind, however, that the Commission asserts that it is entitled to regulate Safe Harbor's rates under both Part I and Part II. In view of the fact that we are of the opinion that the provisions of Section 3(13) are not binding on the Commission in establishing a rate base and that the rate regulatory provisions of Section 206, substantially the same as those of Section 20, must be read into Section 20, the divergence in our view of the law from that of the Commission in this connection is too small to be a matter of substance.

We have already passed in this opinion on the legal application of the sections of the Federal Power Act which Safe Harbor and the Commission have contended are involved but we have not discussed as yet the contentions of the parties relating specifically to depreciation and rate base. Safe Harbor has insisted that "net investment" as set out in Section 3 (13) must be applied in order to arrive at a rate base under Section 20, relying, as we have said, on that portion of Section 3(13) which provides as follows: " 'net investment' in a project means the actual legitimate original cost thereof as defined and interpreted in the 'classification of investment in road and equipment of steam roads, issue of 1914, Interstate Commerce Commission', plus similar cost of additions thereto and betterments thereof, minus the sum of the following items properly allocated thereto, if and to the extent that such items have been accumulated during the period of the license from earnings *in excess of a fair return on such investment:* * * * (b) *aggregate credit balances of current depreciation accounts* * * *."* It is reasonably clear from the Commission's opinion that it has attempted to apply the provisions of Section 3(13) though it insists that the statute does not compel it to do so since it can, it says, regulate under Section 206. It is apparent that the Commission has applied correctly the provisions of Section 206, Part II, in arriving at the same rate base. See 5 F.P.C. at pp. 243–247, and also the findings of the Commission 1 to 15 inclusive, 5 F.P.C. 265–268, and findings 19 and 20, id. at p. 269. In other words, the Commission has worked with both hands endeavoring, we think, to apply the provisions of Section 20 in the light of Section 3(13) and also those of Section 206. We think we state the Commission's position correctly when we say that the Commission held in effect that any depreciation taken in a year when there was a fair return on the investment was in fact depreciation taken "in excess of a fair return".

An example, however oversimplified, may prove helpful. Assume that the "actual legitimate investment" of X Company was $1,000,000 in the first year of its operations, a year which we will designate as 1940. Presume further that $110,000 remained from X Company's income after all operating expenses and taxes were paid and that $50,000 represented the depreciation of assets on the company's books. For the purposes of our example let us take 6% or $60,000 as a "fair return" to X Company. $60,000 would then be a reasonable return on the company's $1,000,000 investment. The $50,000 depreciation, however would be held by the Commission under the view expressed in its present opinion (see 5 F.P.C. at pp. 265–268) to be

in excess of a fair return and would be deductible in determining the "net investment" to be employed for ascertaining the rate base in the next fiscal year, 1941. In other words, in the fiscal year 1941 the "net investment" of X Company·would be $950,000. If the depreciation remained at the same figure, $50,000 and $110,000 again remained from the Company's income after operating expenses and taxes had been paid in the year 1941, and assuming again that 6% represented a fair return, it would follow that $57,000, not $60,000, would be a reasonable return to X Company. At the end of a period which could be estimated, presuming that no additions to equipment were made by X Company, the rate base would dwindle to zero as the depreciation account mounted.[22] This seems to be the theory under which the Commission sought to apply the provisions of Section 20 in conjunction with those of Section 3(13) in the instant case.

Safe Harbor, however, if we apply what we understand to be its contentions to the instant example, takes the position that if the "actual legitimate investment" were $1,000,000 and $50,000 represented depreciation at the end of 1940, $110,000 remaining of the Company's income after operating expenses and taxes were paid, the $50,000 depreciation should *first* be deducted from the $110,000 and that the difference between the two amounts, representing net income and depreciation, *viz.*, $60,000, would represent the fair return on X Company's $1,000,000 net investment. Therefore, says Safe Harbor, nothing should be deducted from the $1,000,000; that is to say, X Company should go into the next fiscal year, 1941, with a "net investment" of $1,000,000.

Changing the example slightly let us suppose that the "actual legitimate investment" in X Company was still $1,000,000, that $110,000 again remained after operating expenses and taxes had been paid; and $50,000 continued to be the figure properly deducted from the $110,000 for depreciation. Assume further that for the year in question 5% rather than 6% was a fair return on the $1,000,000. This would mean that only $50,000 could be properly allocated to profits or return for that year instead of $60,000. The $10,000 of $110,000 which was left over after normal depreciation and fair return would represent a sort of surplus but one not legitimately available for X Company's profit account since X Company already had earned a "fair return". If this $10,000 were allocated to the Company's depreciation account, the figure would represent "depreciation in excess of a fair return" under Section 3(13). Even Safe Harbor admits that this $10,000 would be deducted from the rate base, but it insists that only such a surplus depreciation could be deducted under Section 3(13).

The foregoing examples set out we think the conflicting views of the Commission and of Safe Harbor in what each deems to be the proper application of the provisions of Section 3(13) under the circumstances of the instant case. It is not necessary to resolve the conflict, however, for in our opinion, as we have stated, the Commission is not required to apply the Section 3(13) formula in order to arrive at a rate base.

We come now to the actual figures involved in the instant case. The Commis-

---

22. If, however, still taking the example of X Company, we assume a fair return to be $60,000 for the fiscal year 1940 and depreciation at the same figure, viz., $50,000 and net income after deduction of operating expenses and taxes to be $100,000, we see that the funds are insufficient for a fair return and proper depreciation. In such a case the Commission would have to concede that depreciation accounts would be deducted from the rate base only "to the extent" that they are in excess of a fair return. Since in this example $60,000 is the fair return, only $40,000 would be deductible from the rate base. Safe Harbor, as we analyze its position, seems in fact to contend that depreciation should never be deducted from the rate base. This may be criticized as an oversimplification but it is the practical result of Safe Harbor's position.

sion properly has employed the year 1943 as a typical year and has made the following statement of Safe Harbor's rate base:

"Actual legitimate invest-
| | |
|---|---|
| ment | $30,141,176 |
| Reserve for depreciation | 1,575,674 |
| Net investment | 28,565,502 |
| Working capital | 220,000 |
| Rate base, 1943 | 28,785,502." [23] |

It is Safe Harbor's position, as we understand it, that its "net investment" under Section 3(13), is the actual legitimate original cost of its project, *viz.*, $30,141,176, as shown in the first column above, without any deduction therefrom. Safe Harbor relies on the dictum of Judge Learned Hand in Niagara Falls Power Co. v. Federal Power Commission, 2 Cir., 137 F.2d at page 792, in which it was stated that "net investment" is "the base upon which the rates are to be calculated if it [the hydroelectric project] ever engages in interstate or foreign commerce, § 20 * * *", and on a substantially similar statement in Mr. Justice Miller's opinion, in the Alabama Power Co. case, 128 F.2d at page 293, which declared that "The formula for valuation of properties of licensees, for rate making purposes, is contained in the provisions of sections of the 1920 Act, which were incorporated into Part I of the Federal Power Act of 1935." Safe Harbor seeks to rely on the language of Section 3(13) which we have quoted.

Safe Harbor points out that in that portion of the Commission's opinion and order dealing with rate reduction, finding that a 5% return on the rate base is a fair one, the Commission determined, again using the year 1943 as typical, that a rate reduc-

tion of $627,551, computed as below, would necessarily result:

| | |
|---|---|
| "Operating Revenues | $3,620,412 |
| Operating Revenue Deductions: | |
| Operating Expenses | 633,162 |
| Depreciation | 504,100 |
| Taxes, except Federal Income | 143,110 |
| Federal Income Tax | 273,214 |
| Total Revenue Deductions | 1,553,586 |
| Net Operating Income | 2,066,826 |
| Return on Net Investment —5% | 1,439,275 |
| Excess Revenue | $ 627,551" [24] |

Safe Harbor shows, to use its own phrase, that the item "earnings" [25] is computed in the foregoing calculation as the amount of the "net operating income", *viz.*, $2,066,822, arrived at only *after* deducting the allowance for depreciation, *viz.*, $504,100.[26] Safe Harbor points out that the finding of "excess earnings" made by the Commission Finding (19), 5 F.P.C. at p. 269, is based on the present day correct conception of earnings, *viz.*, that "earnings" are the amount remaining after deducting operating expenses, including taxes and depreciation and that there can be no return to the licensee until proper provision has been made *out of revenues* for depreciation. With this we agree. But Safe Harbor also contends that a basic inconsistency exists between the findings of the Commission in regard to "excess earnings", Finding (13) and its Findings (19) and (20) 5 F.P.C. at pp. 268–269, in that in the latter findings the Commission has determined the amount of "excess earnings" and ordered a reduction in rates which will eliminate them while in Find-

---

23. We designate this statement for the sake of convenience as the "Rate Base Statement".

24. We will designate this statement for the sake of convenience as the "Operating Revenues Statement".

25. See p. 55 of Safe Harbor's brief in chief.

26. The figure of $504,100 is arrived at by the Commission by use of a "straight line" depreciation method. See 5 F. P. C. at pp. 545–557. The propriety of using a "straight-line" method of depreciation is discussed at a later point in this opinion and need not be presently gone into.

ing (13) the Commission has declared that *after* such elimination the amount credited to the depreciation reserve, " * * * will continue to be accumulated from earnings in excess of a fair rate". As we understand the situation, however, one of the reasons for Finding (13) was that the Commission believed that it had to follow the Section 3(13) formula. Another reason why the Commission made Finding (13) lies in the fact that all of it save two sentences [27] is a proper finding under Section 206. In other words Finding (13) seems to embrace the Commission's two theories of rate base finding; *viz.*, rate base finding under its conception of rate base finding bottomed on Section 3(13) via Section 20 and also rate base finding under Section 206. The finding has a foot in both Parts I and II of the Act and for this reason is somewhat ambiguous. The same comment may be appropriately made in respect to Findings (10), (12) and (20).[28] To reiterate, if the Commission had applied the provisions of Section 20, *sans* the interpolation of its construction of Section 3(13), Finding (13) would have been unassailable in all respects. The Commission attempted to apply and did clearly make use of the regulatory provisions of Section 206 which, as we have endeavored to show, contained no important variance in regulatory effect from those of Section 20 as we have construed it.

■ Our problem then becomes one of dissection. Can those portions of Findings (1) to (4) inclusive, and of Findings (10), (12), (13) and (20) which the Commission directed to an interpretation of the regulatory provisions of Section 20 because of the interpolation of Section 3 (13) be excised from its 20 findings, leaving an adequate basis to sustain the order of the Commission on the regulatory provisions of Section 206 read in the light of Section 20 *sans* the provisions of Section 3(13)? We conclude that the Commission's findings and opinion are such that this result may be effected with due regard for the rights of Safe Harbor. The application by the Commission of the provisions of Section 206 seem to us to be clearly separable and capable of standing by themselves.

B. *Has the Commission correctly applied the regulatory provisions of Section 206 in the light of Section 20?* The Commission, using the year 1943 as typical, a course which is fully justified by the record, arrived at a figure of $30,141,176 as the "Actual legitimate investment" of Safe Harbor. See the "Rate Base Statement", note 23, supra. There is no dispute as to this figure. The Commission then took the depreciation reserve as recorded in Safe Harbor's books as of December 31, 1943 in the amount of $1,691,629.44 and for the purpose of determining a proper rate base for the year 1943, used as accrued depreciation the average amount recorded in Safe Harbor's depreciation reserve for that year which was $1,575,674. Deducting the figure last mentioned, the Commission then found a "net investment" of Safe Harbor for the year 1943 in the amount of $28,785,502.

■ What the Commission did was to use the customary and normal practice or technique of deducting depreciation in the course of arriving at a rate base. Such a course must be deemed to be proper in view of the principle enunciated in Federal Power Commission v. Hope Natural Gas Co., supra, for it is an eminently reasonable and sensible one. It is true that the Commission designated the sum of $28,565,502, (net after deducting $1,575,-674, "Reserve for depreciation", from $30,-

---

27. The two sentences read as follows: "The recorded depreciation reserve has been accumulated from earnings in excess of a fair rate of return", and "Under the provisions of the order hereinafter prescribed, such depreciation reserve *will continue to be accumulated* from earnings in excess of a fair rate of return." These sentences look to the Section 3

(13) formula which we believe the Commission has applied erroneously and which in our opinion it should not have sought to apply at all.

28. Findings (16) and (17) relate to methods of depreciation and "service lives" and are not germane to the issue which we are now discussing."

141,176, "Actual legitimate investment") as "Net investment" and the sum of $28,565,502 possibly should not have been so designated. The dispute here, however, is really one of terms, not of substance, for the phrase "net investment" as used in Section 3(13), Part I, is a term of art under the definition imposed by Section 3 (13). The Commission used a magic name which seems at first glance to canalize its finding solely to Section 3(13). But the fact remains that the figure of $28,565,502 validly describes Safe Harbor's position when a correct depreciation figure is deducted from the company's capital investment and may properly be employed in arriving at a rate base pursuant to the provisions of Section 206. The figure of depreciation employed by the Commission, *viz.*, $1,575,674, is a reasonable one and the Commission has taken it from the books of Safe Harbor with what we deem to be proper safeguards. We can perceive no sound basis for further dispute in respect to this use of the item. To the amount of $28,565,502 the Commission has added the sum of $220,000 as working capital, an amount which concededly is proper. A rate base for the year 1943 of $28,785,502, is thus created.

Turning again to what we have hereinbefore designated as the "Operating Revenues Statement" it appears that the operating revenues of Safe Harbor for the year 1943 amounted to $3,620,412 and that the total of operating revenue deductions was $1,553,586, leaving a "net operating income" of $2,066,826. 5% on "Net investment" (.05 times $28,785,502, the rate base) amounts to $1,439,275, creating "Excess Revenue" of $627,551. Before it can be said that the amount of $627,551 is in

fact excess revenue it is necessary to discuss other contentions of Safe Harbor and of the Commission.

We should point out that Safe Harbor vigorously asserts that even if its rates be regulated under Section 206 it is entitled as a matter of law to an undepreciated rate base. As we have indicated we find this contention to be without merit. Nothing in Section 206 requires such a result, and Section 206 with the interpolation of the provisions of Section 20, less those of Section 3(13), does not necessitate such a conclusion. As we view the law, the Commission is entitled to depreciate Safe Harbor's capital investment and deduct depreciation in a proper amount so long as the rate of depreciation is a reasonable one justified by all the circumstances. Such a conclusion seems to us to rest upon the interpretation of the Supreme Court in the Hope Natural Gas Company case, which we think provides a persuasive analogy for the determination of this aspect of case at bar. We will deal with "Depreciation" at greater length under the following sub-heading.

C. *Is the item designated "Depreciation" in the amount of $504,100 in the "Operating Revenues Statement" correct?* The amount of $504,100 representing depreciation results because the Commission has required Safe Harbor to adopt the so-called "Straight-Line" method of depreciation beginning January 1, 1947 " * * * for the purpose of computing its bills for energy or power * * * ". See the order under review. The Commission has found the straight-line depreciation method to be the proper and adequate method under Section 302 [29] of the Federal Power Act.

29. Section 302 provides as follows:
 "(a) The Commission may, after hearing, require licensees and public utilities to carry a proper and adequate depreciation account in accordance with such rules, regulations, and forms of account as the Commission may prescribe. The Commission may, from time to time, ascertain and determine, and by order fix, the proper and adequate rates of depreciation of the several classes of property of each licensee and public utility.

Each licensee and public utility shall conform its depreciation accounts to the rates so ascertained, determined, and fixed. The licensees and public utilities subject to the jurisdiction of the Commission shall not charge to operating expenses any depreciation charges on classes of property other than those prescribed by the Commission, or charge with respect to any class of property a percentage of depreciation other than that prescribed therefor by the Commis-

In addition to the foregoing the Commission held that the "Service lives used by Safe Harbor in accounting for depreciation for the year 1943 * * *" as set forth in Exhibit 39 are reasonable and proper to be used in connection with the straight-line method of depreciation. See Findings (16) and (17), 5 F.P.C. at pp. 268–269. The Commission stated in its opinion, 5 F.P.C. at p. 257, "Safe Harbor's depreciation reserve, however, is deficient by about $3,000,000 as compared with its reserve requirement calculated on a straight-line basis and using the service-life estimates which it has been using. This deficiency must ultimately be made up if the capital impairment is to be avoided. For this reason and because the service-life estimates used by Safe Harbor in 1943 are within the realm of reasonableness, we think their use is proper. Hereafter, the annual depreciation charge shall be computed according to the straight-line method on the basis of the service-life estimates used by Safe Harbor in 1943."

It is not necessary to include herein an extended discussion of the "Straight-Line" method of depreciation as compared with the "Compound-Interest" method or the "Sinking-Fund" method. These methods are clearly described in the Commission's opinion, 5 F.P.C. at pp. 246–256. It is true that by its order of June 11, 1940 the Commission prescribed for Safe Harbor the use by it of the compound-interest method, stating in its opinion, 2 F.P.C. at p. 189, "Considering all the circumstances in this case, it is believed that the 4¼% compound-interest depreciation method should be employed rather than the straight-line or sinking-fund method." It appears that the service lives appearing on Exhibit 39 had been employed by Safe Harbor in accounting for depreciation in conjunction with the 4¼% compound-interest method of depreciation. This was required by the Commission's order of June 11, 1940. See 2 F.P.C. at pp. 186–187, 194.

Safe Harbor makes a vigorous attack on the findings of the Commission referred to. It asserts that the Commission's result increases the annual allowance for depreciation for the year 1944 from approximately $237,000 to $504,000 and contends that the Commission's " * * * findings are wholly unsupported by any credible evidence whatever", that as a matter of law it was necessary for the Commission to have had exhaustive studies of depreciation made by qualified engineers before it could issue valid orders either as to the extent of depreciation existing in Safe Harbor's property or the correct amount of annual depreciation expense in the future, citing inter alia Pacific Gas & Electric Co. v. City and County of San Francisco, 265 U.S. 403, 44 S.Ct. 537, 68 L.Ed. 1075, and Lindheimer v. Illinois Bell Telephone Co., 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182. Exhibit 39 estimates service lives for Safe Harbor's depreciable physical property and equipment. This was referred to in the Commission's opinion in 2 F.P.C. at pp. 188–189, and was imposed on Safe Harbor by the Commission's order of June 11, 1940, which this court set aside.

 There is little to be added to what the Commission has stated in its opinion respecting *observed* depreciation evidence as a measure of accrued depreciation. The Commission, quite properly we think,

sion. No such licensee or public utility shall in any case include in any form under its operating or other expenses any depreciation or other charge or expenditure included elsewhere as a depreciation charge or otherwise under its operating or other expenses. Nothing in this section shall limit the power of a State commission to determine in the exercise of its jurisdiction, with respect to any public utility, the percentage rate of depreciation to be allowed, as to any class of property of such public utility, or the composite depreciation rate, for the purpose of determining rates or charges.

"(b) The Commission, before prescribing any rules or requirements as to accounts, records, or memoranda, or as to depreciation rates, shall notify each State commission having jurisdiction with respect to any public utility involved, and shall give reasonable opportunity to each such commission to present its views, and shall receive and consider such views and recommendations."

rejected the theory of observed depreciation preferring to estimate depreciation as a "using-up of service life" and not as a "sudden event which occurs in the final stages of service." See 5 F.P.C. at p. 250. The Commission has employed a method of depreciation which will afford great certainty to rate base making whereas Safe Harbor prefers that method which will result in a much higher rate base over a long period of time. That the straight-line depreciation method now ordered by the Commission is desirable seems to us to be open to no serious question. See for example "Prudent Investment", Bauer, 53 Yale L.J. 495, 505 et seq. (1944), and "Depreciation and Effective Rate Control", by the same authority, 54 Yale L.J., 92 et seq. (1944).

We reject Safe Harbor's contention that Exhibit 39, introduced into evidence in the instant case, does not afford a factual basis for the conclusions of the Commission as to service lives. The determination of service lives is one which rests peculiarly within the expert administrative discretion of the Commission. See Section 302(a), Part III. Whether the estimates contained in Exhibit 39 be used in connection with the compound-interest method of depreciation or the straight-line method is immaterial. These estimates will stand as one of the bases for either method.

The position of Safe Harbor in respect to the service lives of its dam, forebay, ramp, tailrace and powerhouse is not clear to us, but Safe Harbor seems to contend that these properties are really non-depreciable. Against the present factual background we cannot say that the Commission erred in finding certain properties depreciable which Safe Harbor asserts should be depreciated over a much longer period or in effect not depreciated at all. We cannot say that the conclusion of the Commission that certain physical properties possess a life of one hundred years is either capricious or arbitrary. The most solid physical object will deteriorate in time and by reason of a wide variety of circumstances. Many of the physical and economic sources that may bring about depreciation are not observable or visible. What Safe Harbor has done in offering the study of

two engineers respecting depreciation in its physical properties is to present an issue of fact which lies distinctly within the province of the Commission. We may not try such issues.

It must be conceded that the Commission's position in respect to the depreciation method to be applied has been altered by time and, we may presume, by greater knowledge. As we have indicated, it compelled Safe Harbor by its order of June 11, 1940 to make use of the compound-interest method of depreciation employing 4¼% and rejected the straight-line and sinking-fund methods. But an agency is not compelled to be consistent, though consistency is a jewel in any crown. It is clear that by compelling Safe Harbor to adopt, although in midstream, a different method of accounting the Commission has not deprived Safe Harbor, its stockholders or the public of any substantial right. The Commission has acted in what it deems to be the public interest and has advanced sound reasons for a change of policy. There is no basis for judicial interference here.

We conclude, therefore, that the item designated "Depreciation" in the "Operating Revenues Statement" represents a correct and a proper application of the statute. The other deductions in the "Operating Revenues Statement" do not require explanation or discussion since there can be no serious dispute as to their validity.

### III. Rate of Return.

A. *Has the Commission unduly minimized Safe Harbor's risks, given undue weight to its power contracts and to the backing of its parent companies, fallaciously disregarded the actual cost of Safe Harbor's bond money or failed to give proper weight to similar factors?* We do not propose to discuss the contentions of Safe Harbor in these respects at length. Upon full consideration we cannot conclude that the Commission has unduly minimized Safe Harbor's financial risks. It would be difficult to conceive of a more secure hydroelectric project. Safe Harbor's contracts for power and its backing by the Pennsylvania and Maryland Companies are exemplary. It is true the Commission has decided

that the actual cost of Safe Harbor's bond money, 5.25%, should not be employed because it has considered Safe Harbor to be tardy in refinancing at a lower figure. The Commission stated, "There could be no doubt that Safe Harbor can refinance at a great saving in interest cost. We have no doubt that it could refund today at a cost not to exceed 3 percent." See 5 F.P.C. at p. 260, an the star note cited to the text. The conclusion of the Commission seems fully justified. See Bluefield Water Works & Improvement Co. v. Public Serv. Comm., 262 U.S. 679, 692–693, 43 S.Ct. 675, 67 L.Ed. 1176, and United Railways & Electric Co. of Baltimore v. West, 280 U.S. 234, 251, 50 S.Ct. 123, 74 L.Ed. 390. We can perceive no issue which can arise under the Fifth Amendment on this question. Nor can we agree that the Commission's order imposes upon investors the net cost of the retention of reserve assets, thereby compelling Safe Harbor to render service to consumers at less than cost. This argument is answered, we think, by what has been hereinbefore stated in respect to propriety of the rate base found by the Commission and by what will be said hereinafter respecting the fair return to Safe Harbor and hence to its investors. But if the rate base be a fair one and the rate of return found by the Commission be justified, "The net cost of the retention of reserve assets", to employ Safe Harbor's words, assuming this to be more than a mere bookkeeping figure, will not result in damage to Safe Harbor, to its investors or to its rate payers. It cannot become a detriment if the rate of return be a fair one. Safe Harbor will not be compelled to render service to its consumers at less than "full cost". The charges which Safe Harbor will be permitted to make to its consumers will be fair and reasonable both to them and to it. Other arguments made by Safe Harbor, assimilable to this heading, do not require discussion.

■ B. *Is the rate of return of 5% found by the Commission a "fair return"?* This question is indeed the important one in the case and everything which we have previously stated is intended to lead to what we believe is the proper answer. Categorically stated that answer is "Yes." Safe

Harbor's major argument to be dealt with under this heading is that the investment of Safe Harbor's securities and its ability to render adequate service to its consumers, to function properly as a hydroelectric project dispensing electric energy in interstate commerce, will be destroyed or seriously impaired by the order of the Commission. The Commission made a complete study of Safe Harbor's economic record as well as of its physical properties. Every pertinent issue has been fully discussed and considered by the Commission. The findings of the Commission find full support in the record and its conclusions of law, except possibly those based on Section 3(13), Part I, are in accord with the Federal Power Act. A major question presented for determination by the Commission was the ascertainment of a proper rate base for Safe Harbor. This problem is really one of valuation and of accounting. The other major question for the Commission was the determination of a "fair return" on that rate base. Both questions are peculiarly within the administrative capacity of the Commission. A persuasive analogy is presented, we think, by the decision of the Supreme Court in S. E. C. v. Central-Illinois Corp., 338 U.S. 96, 113-127, 69 S.Ct. 1377. In the cited case Mr. Justice Rutledge stated in substance that the finding of the Securities and Exchange Commission as to valuation based upon expert judgment, discretion, prediction supported by evidence and "fact" and made pursuant to rational statutory construction, were not subject to reexamination on judicial review under Section 11(e) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79k (e). Cf. Section 206(a) of the Federal Power Act. See Section 313(b), Part III, which provides that "The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." There are differences between the Federal Power Act and the Public Utility Holding Company Act of 1935 but the principle enunciated by the Supreme Court in the cited case seems to delimit the powers of a court reviewing the determinations of an administrative agency within the field confided to it by Congress. The provisions of Section

313(b) of the Federal Power Act are explicit. The scope of our review therefore is circumscribed but we may state that were we reviewing the matter *de novo* we would reach the same conclusions as those expressed by the Commission.

We have held that the rate base ascertained by the Commission is a proper one in the light of all the circumstances and we have ruled in effect that the Commission in applying Section 206, Part II, arrived at an interpretation of the Federal Power Act which gave a correct statutory result for the reasons hereinbefore stated and which need not be repeated here. We went further and searched the factual basis employed by the Commission in arriving at the rate base and we have been able to find no serious disparity in the views expressed by the Commission and in our own. If the analogy presented by the Central-Illinois Corporation case, supra, be persuasive, and we think that it is, controversy as to Safe Harbor's rate base should be at an end.

As to rate of return, similar considerations must prevail. The amount of rate of return is preeminently a question for determination by the Commission and the rate of return prescribed by it for Safe Harbor would have to be clearly confiscatory or outside the purview of the statute to permit judicial interference with the determination. We are aware of course that the Commission in its 1940 decision fixed 6% as a fair rate of return, 2 F.P.C. at p. 194. It should be noted that that rate of return was fixed by the Commission after applying the formula of Section 3(13), Part I. This may have had its effect upon the present determination by the Commission but in any event no rate of return is nailed to the Commission's head.

Safe Harbor contends that the Commission's finding that 5% constitutes a fair and reasonable rate of return is unsupported by substantial evidence and is not in accordance with law. This position cannot be sustained. The evidence in the record on rate of return is extensive indeed and we shall not review it in this too lengthy opinion. The Commission has adhered to the doctrine enunciated in Bluefield Water Works & Improvement Company v. Public Serv. Comm., 262 U.S. at page 693, viz., 43 S.Ct. at page 679, "The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties."

The rate fixed by the Commission assures a fair return in our judgment but again the scope of our review is limited by analogy to the Central-Illinois Corporation case, supra. In conclusion on this aspect of the instant case it seems desirable to repeat the words employed by Mr. Justice Douglas in the Hope Natural Gas Co. case (Federal Power Comm. v. Hope Natural Gas Co.), 320 U.S. 591, at page 602, 64 S.Ct. 281, at page 288, 88 L.Ed. 333, "If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." No such showing has been made by Safe Harbor in the instant case.

Other points raised by Safe Harbor and by the Commission do not require discussion.

The order of the Commission will be affirmed.

Judge O'CONNELL heard the argument and participated in the consideration of this case but died before it was decided.